# BAY RIDGE OPERATING CO., INC. *v.* AARON ET AL.

NO. 366.

Argued January 12, 1948.—Decided June 7, 1948.

*Assistant to the Attorney General Ford* and *Marvin C. Taylor* argued the cause for petitioners. With them on the brief were *Solicitor General Perlman, Herbert A. Bergson, Paul A. Sweeney* and *Harry I. Rand.*

*Monroe Goldwater* argued the cause for respondents. With him on the brief were *Max R. Simon* and *James L. Goldwater.*

*Nathan Baker* filed a brief for Frank Adams, as *amicus curiae,* urging affirmance.

Briefs of *amici curiae* urging reversal were filed by *Raymond S. Smethurst* and *Lambert H. Miller* for the National Association of Manufacturers; *Louis Waldman* for the International Longshoremens Association; and *Gregory A. Harrison, William Radner* and *Mary L. Schleifer* for the Waterfront Employers Association.

MR. JUSTICE REED delivered the opinion of the Court.

These cases present another aspect of the perplexing problem of what constitutes the regular rate of pay which the Fair Labor Standards Act requires to be used in computing the proper payment for work in excess of forty hours. The applicable provisions read as follows:

> "Sec. 7. (a) No employer shall, except as otherwise provided in this section, employ any of his

employees who is engaged in commerce or in the production of goods for commerce—

.        .        .        .        .

(3) for a workweek longer than forty hours after the expiration of the second year from such date,

unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." [1]

The problem posed is the method of computing the regular rate of pay for longshoremen who work in foreign and interstate commerce varying and irregular hours throughout the workweek under a collective bargaining agreement for handling cargo which provides contract straight time hourly rates for work done within a prescribed 44-hour time schedule and contract overtime rates for all work done outside the straight time hours. [2]

These two suits were brought as class actions on behalf of all longshoremen employed by two stevedoring companies, Bay Ridge Operating Co., and Huron Stevedoring

---

[1] 52 Stat. 1060, 1063, approved June 25, 1938; § 7 (a) took effect 120 days later, § 7 (d). No problem as to the length of time any employee worked is presented. See *Tennessee Coal Co.* v. *Muscoda Local,* 321 U. S. 590; *Anderson* v. *Mt. Clemens Pottery Co.,* 328 U. S. 680. Portal-to-Portal Act of 1947, 61 Stat. 84.

[2] The use of the word "overtime" in the contract does not decide this case. The problem for solution is whether rates described as "overtime" by the contract actually are such rates as § 7 (a) provides for statutory excess hours.

As will hereafter appear, we consider the contract as intending to provide statutory excess compensation and overtime premium. Consequently, we accept the word "overtime" used in the contract to describe one wage scale as having been intended by the parties to the contract to satisfy fully the requirements of § 7 (a).

Corp., to recover unpaid statutory excess compensation [3] in accordance with § 16 (b) of the Fair Labor Standards Act.[4] By stipulation the claims of ten specific longshoremen in each case were severed and the two suits were consolidated for trial, leaving the claims of the other plaintiffs pending on the docket. The claims of the plaintiffs here are for the period October 1, 1943, to September 30, 1945.

---

[3] The following phrases are used in this opinion with the following meaning. These definitions do not apply to quotations.

*Extra pay.*—Any increased differential from a lower pay scale for work after a certain number of hours in a workday or workweek or for work at specified hours.

*Overtime premium.*—Extra pay for work because of previous work for a specified number of hours in the workweek or workday whether the hours are specified by contract or statute.

*Statutory excess compensation.*—Additional compensation required to be paid by § 7 (a), F. L. S. A.

*Regular rate of pay.*—Total compensation for hours worked during any workweek less overtime premium divided by total number of hours worked.

The following definitions apply to the circumstances of this contract only:

*Contract straight time.*—Compensation paid under the longshoring contract for work during the hours defined in par. 3 (a) of the contract, as follows: 8 a. m. to 12 noon and from 1 p. m. to 5 p. m., Monday to Friday, inclusive, and from 8 a. m. to 12 noon Saturday.

*Contract overtime.*—Additional compensation which the contract requires shall be paid for work on legal holidays and for work at hours other than those specified in par. 3 (a).

[4] 52 Stat. 1069, § 16:

"(b) Any employer who violates the provisions of section 6 or section 7 of this Act shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages. . . . The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action."

The terms of employment for the respondents, long-shoremen working in the Port of New York, were fixed for the period in question by the collective bargaining agreement between the International Longshoremens Association and the New York Shipping Association together with certain steamship and stevedore companies. It was applicable to the two petitioners. The agreement established a "basic working day" of eight hours and a "basic working week," that is, workweek, of forty-four hours; hourly rates for different types of cargo were specified for work between 8 a. m. and 12 noon and between 1 p. m. and 5 p. m. during five working days of the week, Monday through Friday, and from 8 a. m. to 12 noon on Saturday, and a different schedule of rates for work during all other hours in the workweek. The first schedule was called "straight time" rates, and the second schedule was entitled "overtime" rates. This opinion designates these rates as contract straight time and contract overtime. For four types of cargo the overtime rates were exactly one and a half times the straight time rates; for four other types the overtime rates were slightly less than one and a half times the straight time rates. The contract straight time rates ranged from $1.25 to $2.50 an hour. The contract overtime rates were paid for all work on Sundays and legal holidays. The contract provided for no differential for work in excess of forty hours in a week.[5]

---

[5] The Agreement contains the following provisions with respect to the hours of work and scale of wages:

I. General Cargo Agreement.

"1. Members of the party of the second part shall have all of the work pertaining to the rigging up of ships and the coaling of same, and the discharging and loading of all cargoes including mail, ships' stores and baggage. When the party of the second part cannot furnish a sufficient number of men to perform the work in a satis-

Respondents claim that their regular rate of pay under the contract for any workweek, within the meaning of

---

factory manner, then the party of the first part may employ such other men as are available.

"2. (a) The basic working day shall consist of 8 hours, and the basic working week shall consist of 44 hours. Men shall work any night of the week, or on Sundays, Holidays, or Saturday afternoons, when required. On Saturday night, work shall be performed only to finish a ship for sailing on Sunday, or to handle mail or baggage.

"(b) Meal hours shall be from 6 A. M. to 7 A. M., from 12 Noon to 1 P. M., from 6 P. M. to 7 P. M., and from 12 Midnight to 1 A. M..

.    .    .    .    .

"(c) Legal Holidays shall be: New Year's Day, Lincoln's Birthday, Washington's Birthday, Good Friday on the New Jersey Shore, Decoration Day, Fourth of July, Labor Day, Columbus Day, Election Day, Armistice Day, Thanksgiving, Christmas, and such other National or State Holidays as may be proclaimed by Executive authority.

.    .    .    .    .

"3. (a) Straight time rate shall be paid for any work performed from 8 A. M. to 12 Noon and from 1 P. M. to 5 P. M., Monday to Friday, inclusive, and from 8 A. M. to 12 Noon Saturday.

"(b) All other time, including meal hours and the Legal Holidays specified herein, shall be considered overtime and shall be paid for at the overtime rate.

"(c) The full meal hour rate shall be paid if any part of the meal hour is worked and shall continue to apply until the men are relieved.

"4. Wage Scale: The wage scale shall be as follows:

|  | Straight Time Hourly Rate | Overtime Hourly Rate |
|---|---|---|
| "(a) General Cargo of every description, including barrel oil when part of General Cargo, and all General Cargo handled in refrigerator space with the temperature above freezing ........................... | $1.25 | $1.87½" |

Extra rates are paid for special types of cargo. For example:

| "(d) Wet hides, creosoted poles, creosoted ties, creosoted shingles and soda ash in bags... | $1.40 | $2.02½" |

§ 7 (a), is the average hourly rate computed by dividing the total number of hours worked in any workweek for any single employer into the total compensation received from that employer during that week; and that in those workweeks in which they worked more than forty hours for any one employer they were entitled by § 7 (a) to statutory excess compensation for all such excess hours computed on the basis of that rate. The petitioners claim that the straight time rates are the regular rates, and that they have, therefore, with minor exceptions not presented by this review, complied with the requirements of § 7 (a). That is, no rates except straight time rates are to be taken into consideration in computing the regular rate. The petitioners contend that the contract overtime rates were intended to cover any earned statutory excess compensation and did cover it because they were substantially in an amount of one and one-half times the straight time rates. The District Court held that the contract straight time rates were the regular rates but the Circuit Court of Appeals for the Second Circuit held otherwise.[6]

Throughout all these proceedings the petitioners have been represented by the Department of Justice, since the United States under its cost-plus contracts with the petitioners is the real party in interest. Substantially all stevedoring during the war years was performed for the account of the United States. The Solicitor General notes that prior to the decision in the Circuit Court of Appeals, 118 suits had been instituted on behalf of longshoremen, and since that time approximately 100 new complaints have been filed. Contracts of the same general type are said to have been in effect in all our maritime areas. Witnesses testifying before the Wages and Hours

---

[6] *Addison* v. *Huron Stevedoring Corp.,* 69 F. Supp. 956; *Aaron* v. *Bay Ridge Operating Co.,* 162 F. 2d 665.

Subcommittee of the House Committee on Education and Labor stated that liability of the Government under such suits would be large.[7] The Wage and Hour Administrator has not filed a brief in the proceedings, but the Solicitor General has advised us that the Administrator of the Wage and Hour Division of the Department of Labor "believes that proper consideration was given by the court below to his interpretation of Section 7 of the Fair Labor Standards Act and that the decision below is correct." The Administrator and the Solicitor of the Department of Labor testified at length before the House committee as to their views on the issues presented by these cases.[8] *Amicus* briefs have been filed by the International Longshoremens Association, the National Association of Manufacturers, and the Waterfront Employers

---

[7] Mr. Walter E. Maloney, representing the National Federation of American Shipping, testified that liability to the Government on stevedoring contracts might run as high as $260,000,000, although he admitted that the amount of liability was "almost impossible to calculate." Hearings before Subcommittee No. 4 of the House Committee on Education and Labor, 80th Cong., 1st Sess., pp. 1198–1205. Committee members referred to the amounts in question as $236,000,000, $340,000,000, and $300,000,000. Hearings, *supra,* pp. 1203, 2283, 2469. The basis for such figures does not appear. Nor is it made clear whether the Portal-to-Portal Act was in mind. 61 Stat. 84, 88, 89, Pt. IV, §§ 9 and 11.

The International Longshoremens Association claims to have approximately 80,000 members in United States and Canada. Thirty thousand are said to work in the Port of New York, and the terms adopted in the New York contract are generally followed in other ports. The Waterfront Employers Association of the Pacific Coast states that 20,000 stevedores are covered by 21 collective bargaining contracts, of which 3 are with the International Longshoremen's and Warehousemen's Union. The current New York contract with the I. L. A. and the 21 agreements between the Pacific Association and the I. L. A. and I. L. W. U. are said to contain clauses permitting cancellation if the courts sustain the claims of plaintiffs in this suit.

[8] Hearings, *supra,* note 7, 2467–2471; 2474–2482; 2736–2762.

Association of the Pacific Coast, all urging that the decision below be reversed.

In order to fix the legal issues in their factual setting, we summarize the findings of fact made by the District Court which were accepted by the Circuit Court of Appeals and are not challenged here. Most of these findings referred to in this opinion will be found in the Appendix at 162 F. 2d 670. Employment in the longshore industry has always been casual in nature. The amount of work available depends on the number of ships in port and their length of stay and is consequently highly variable and unpredictable, from day to day, week to week, and season to season. Longshoremen are hired for a specific job at the "shape," [9] which is normally held three times a day at each pier where work is available. The hiring stevedore selects the men he desires from the longshoremen who are present at the "shape"; in some instances a group of longshoremen are hired together as a gang. The work may last only for a few hours or for as long as a week. Although some work is carried on at all hours, the stevedoring companies, since operations are then carried on at less cost, attempt to do as much work as possible during the straight time hours.

---

[9] The trial court gave the following explanation of the "shape," Finding 16:

"At three stated hours during the day, namely at 7.55 a. m., 12.55 p. m. and 6.55 p. m., men seeking employment gather in a group or semicircle, constituting the 'shape,' at the head of a pier where work is available. The foreman stevedore then selects from the 'shape' such men as he desires to hire, to work until 'knocked off,' that is, told to quit. The selection of a man from the shape carries with it no obligation on the part of the employer concerning any specified length of employment, except for work requirements of the Collective Agreement relating to minimum hours under specified conditions. The duration of employment depends entirely upon the determination of the stevedore or the steamship company."

The court further found that the rate for night work and holiday work had been higher than the rate for day work since at least as far back as 1887, and that since 1916, when the first agreement was made with the International Longshoremens Association, the differential had been approximately 50%. Joseph B. Ryan, President of the Association, testified that the differential was designed to shorten the total number of hours worked and to confine the work as far as possible within the scheduled forty-four hours. Despite the differential, many longshoremen were unwilling to work at night. Although some longshore work was required at all hours, except Saturday night, the District Court found that the differential had been responsible for the high degree of concentration of longshore work to the contract straight time hours.

The government introduced elaborate statistical studies to show the distribution of work as between the contract straight time and contract overtime hours. From 1932 to 1937, 80% of the total hours worked were within the contract straight time hours and only $2\frac{1}{2}\%$ of the total manhours were performed by men working between 5 p. m. and 8 a. m. (exclusive of Sundays and holidays) who had worked no straight time hours earlier that day. During the war, the proportion of work in contract overtime hours was considerably higher because of the greater volume of cargo handled; 55% of the total hours fell within the contract straight time hours, and the ratio of work in contract overtime hours by men who had not previously worked in the contract straight time hours was correspondingly higher. The respondents' employment was highly irregular; in many weeks the respondents did not work at all, and in weeks in which they did work their hours of employment varied over a wide range. The trial court concluded that

the "basic working day" and "basic working week," [10] meaning by these phrases the contract straight time hours, were not the periods "normally, regularly or usually" worked by the respondents. Finding 45.

In giving judgment for the petitioners, the trial court placed emphasis on the fact that the rates in question were arrived at through bona fide collective bargaining, and were more favorable to the longshoremen than the statutory mandate required. That is, that rates as high as contract straight time rates plus statutory excess compensation were paid to all workers for all work in contract overtime hours whether required by § 7 (a) or not. The District Court opinion referred to Joseph B. Ryan's statement that the International Longshoremens Association was opposed to the suit "as it might wipe out all of the gains we had made for our men over a period of 25 years." [11] It rejected respondents' alternative contentions

[10] The trial court found, Finding 13, that "The work week commenced on Monday at 7 a. m., and ended the following Monday at 7 a. m." The 44-hour week had been in the contracts between the Shipping Association and the Longshoremens Association prior to the Fair Labor Standards Act. No adjustment of the basic workweek was made in the contract when the 42- and 40-hour provisions of § 7 (a) became effective.

[11] Mr. Ryan explained the Association objective as follows: "Our objective was to de-casualize longshore work as much as possible, to have the work done in the daytime as much as possible, and make it as expensive for the employers as possible on Sunday. Before there was any union we had double time for Sunday. We wanted to work in the daytime. We figured we only live once. We want the daytime when every man who wants to work wants it done in the daytime and not during overtime. The employers would say it cannot be done in the steamship industry. I think we have proven for them that after 30 years of negotiating many of the things they said could not be done in the industry, when they found it too expensive to do it in any other way, have been done.

"Q. Do the men object to working outside of a normal day? A. Absolutely."

Furthermore, as the Longshoremens Association's primary interest

that the regular rate was to be determined by the average rate during the first forty hours or by the average rate for all hours worked. It noted that shift differentials were usually five or ten cents an hour and seldom exceeded fifteen cents and were not designed to deter the employer from working employees during the period for which the differential was paid; in the present case the trial judge found that the 50% differential was designed to deter and actually did deter work outside contract straight time hours. Accordingly the trial court concluded that the "collectively bargained agreement established a regular rate" under the Fair Labor Standards Act—the contract straight time rate. 69 F. Supp. 956, 961.

The Circuit Court of Appeals held that the regular rate must be determined as an "actual fact" and could not be arranged through a collective bargaining agreement, citing *149 Madison Ave. Corp.* v. *Asselta,* 331 U. S. 199. That court therefore concluded that on the basis of the findings below the regular rate must be computed by dividing the total number of hours worked into the total compensation received. The court rejected the contention that the regular rate was the average rate for the first forty hours of work, citing *Walling* v. *Halliburton Oil Well Cementing Co.,* 331 U. S. 17. The judgment of the District Court was reversed with directions to determine the amounts due plaintiffs in the light of the Portal-to-Portal Act of 1947, 61 Stat. 84. No determination of the scope or validity of that act was attempted as those matters had not been argued. 162 F. 2d 665, 673.

---

is as stated above by Mr. Ryan, it fears the effect on their employment contract of a holding that the contract overtime rate must be used in the determination of statutory excess compensation. The Shipping Association might insist on a reduction of the contract overtime rate, if payment of that rate were not to be treated as a satisfaction of the statutory requirements.

On account of the importance of the method of computing the regular rate of pay in employment contracts providing for extra pay, we granted certiorari.[12] 332 U. S. 814.

The government adopts the view of the District Court that the contract straight time rates constituted the regular rates within the meaning of § 7 (a) of the Fair Labor Standards Act. The government accepts, too, the reasoning of the District Court that the contract overtime rates, as they were coercive in the sense that they were intended to exert pressure on employers to carry on their activities in the straight time hours, were not regular rates and could be credited against required statutory excess compensation in the amount that the contract overtime rates exceeded the contract straight time rates. The government argues in the alternative that the "normal, non-overtime workweek," said to be the hours controlling the regular rate of pay, is to be determined by reference to peacetime conditions, rather than the abnormal wartime conditions, and that the statistical studies show that the work of longshoremen is sufficiently concentrated within the scheduled hours to compel the finding that the contract straight time hours are the regular working hours. The government urges also that the contract, as thus interpreted, accords with congressional purposes in enacting the Fair Labor Standards Act. It is said to reduce working hours and spread employment and to preserve the integrity of collective bargaining.

We agree with the conclusion reached by the Circuit Court of Appeals. Later in this opinion, pp. 465–471, we set out our reasons for concluding that the extra pay for contract overtime hours is not an overtime premium. Where there are no overtime premium payments the rule

---

[12] See note 7, *supra*.

for determining the regular rate of pay is to divide the wages actually paid by the hours actually worked in any workweek and adjudge additional payment to each individual on that basis for time in excess of forty hours worked for a single employer. Any statutory excess compensation so found is of course subject to enlargement under the provisions of § 16 (b). Compare § 11 of Portal-to-Portal Act of 1947. This determination, we think, accords with the statute and the terms of the contract.

(1) The statute, § 7 (a), expresses the intention of Congress "to require extra pay for overtime work by those covered by the Act even though their hourly wages exceeded the statutory minimum." The purpose was to compensate those who labored in excess of the statutory maximum number of hours for the wear and tear of extra work and to spread employment through inducing employers to shorten hours because of the pressure of extra cost.[13] The statute by its terms protects the group of employees by protecting each individual employee from overly long hours. So although only one of a thousand works more than forty hours, that one is entitled to statutory excess compensation. That excess compensation is fixed by § 7 (a) "at one and one-half times the regular rate at which he is employed." The regular rate of pay of the respondents under this contract must therefore be found.

The statute contains no definition of regular rate of pay and no rule for its determination. Contracts for pay take many forms. The rate of pay may be by the hour, by piecework, by the week, month or year, and with or without a guarantee that earnings for a period of time shall be at least a stated sum. The regular rate may vary from week to week. *Overnight Motor Co.* v. *Missel,*

---

[13] *Overnight Motor Co.* v. *Missel,* 316 U. S. 572, 577, 578; *Walling* v. *Helmerich & Payne,* 323 U. S. 37, 40; *Brooklyn Bank* v. *O'Neil,* 324 U. S. 697, 706; *Jewell Ridge Corp.* v. *Local,* 325 U. S. 161, 167.

316 U. S. 572, 580; *Walling* v. *Belo Corp.,* 316 U. S. 624, 632. The employee's hours may be regular or irregular. From all such wages the regular hourly rate must be extracted. As no authority was given any agency to establish regulations, courts must apply the statute to this situation without the benefit of binding interpretations within the scope of the Act by an administrative agency.[14]

Every contract of employment, written or oral, explicitly or implicitly includes a regular rate of pay for the person employed. *Walling* v. *Belo Corp., supra,* 631; *Walling* v. *Halliburton Oil Well Cementing Co., supra.* We have said that "the words 'regular rate' . . . obviously mean the hourly rate actually paid for the normal, non-overtime workweek." *Walling* v. *Helmerich & Payne,* 323 U. S. 37, 40. See *United States* v. *Rosenwasser,* 323 U. S. 360, 363. "Wage divided by hours equals regular rate." *Overnight Motor Co.* v. *Missel, supra,* 580. "The regular rate by its very nature must reflect all payments which the parties have agreed shall be received regularly during the workweek, exclusive of overtime payments. It is not an arbitrary label chosen by the parties; it is an actual fact. Once the parties have decided upon the amount of wages and the mode of payment the determination of the regular rate becomes a matter of mathematical computation, the result of which is unaffected by any designation of a contrary 'regular rate' in the wage contracts." *Walling* v. *Youngerman-Reynolds Hardwood Co.,* 325 U. S. 419, 424–25. The result is an "actual fact." *149 Madison Ave. Corp.* v. *Asselta, supra,* 204.

In dealing with such a complex situation as wages throughout national industry, Congress necessarily had to

---

[14] *Kirschbaum Co.* v. *Walling,* 316 U. S. 517, 523; see § 9, Part IV, Portal-to-Portal Act, 61 Stat. 84, 88.

rely upon judicial or administrative application of its standards in applying sanctions to individual situations. These standards had to be expressed in words of generality. The possible contract variations were unforeseeable. In *Walling* v. *Belo Corp., supra,* 634, this Court refrained from rigidly defining "regular rate" in a guaranteed weekly wage contract that met the statutory requirements of § 7 (a) for minimum compensation. In the *Belo* case the contract called for a regular or basic rate of pay above the statutory minimum and a guaranteed weekly wage of 60 times that amount. As the hourly rate was kept low in relation to the guaranteed wage, statutory overtime plus the contract hourly rate did not amount to the guaranteed weekly wage until after 54½ hours were worked. P. 628. We refused to require division of the weekly wage actually paid by the hours actually worked to find the "regular rate" of pay and left its determination to agreement of the parties. Where the same type of guaranteed weekly wages were involved, we have reaffirmed that decision as a narrow precedent principally because of public reliance upon and congressional acceptance of the rule there announced. *Walling* v. *Halliburton Co., supra.* Aside from this limitation of *Belo,* the case itself is not a precedent for these cases as in *Belo* the statutory requirements of minimum wages and statutory excess compensation were provided by the Belo contract. In these present cases no provision has been made for any statutory excess compensation and none can be earned by any respondent based on the contract overtime pay. Our assent to the *Belo* decision, moreover, does not imply that mere words in a contract can fix the regular rate.[15] That

---

[15] *149 Madison Ave. Corp.* v. *Asselta, supra,* p. 204: "The crucial questions in this case, however, are whether the hourly rate derived from the formula here presented was, in fact, the 'regular rate' of pay within the statutory meaning and whether the wage agreement under consideration, in fact, made adequate provision for overtime compensation." *Walling* v. *Harnischfeger Corp.,* 325 U. S. 427, 432.

would not be the maintenance of a flexible definition of regular rate but a refusal to apply a statutory requirement for protecting workers against excessive hours. The results on the individual of the operations under the contract must be tested by the statute.[16] As Congress left the regular rate of pay undefined, we feel sure the purpose was to require judicial determination as to whether in fact an employee receives the full statutory excess compensation, rather than to impose a rule that in the absence of fraud or clear evasion employers and employees might fix a regular rate without regard to hours worked or sums actually received as pay.

Further, we reject the argument that under the statute an agreement reached or administered through collective bargaining is more persuasive in defining regular rate than individual contracts. Although our public policy recognizes the effectiveness of collective bargaining and encourages its use,[17] nothing to our knowledge in any act authorizes us to give decisive weight to contract declarations as to the regular rate because they are the result of collective bargaining. *149 Madison Ave. Corp.* v. *Asselta, supra,* 202 and 204; *Walling* v. *Harnischfeger Corp.,* 325 U. S. 427, 432.[18] A vigorous argument is presented for petitioners by the International Longshoremens Association that a collectively obtained and administered agree-

---

[16] *Walling* v. *Youngerman-Reynolds Hardwood Co., supra,* 424; *Walling* v. *Harnischfeger Corp., supra,* 430.

[17] National Labor Relations Act, 49 Stat. 449; Labor Management Relations Act of 1947, 61 Stat. 136; Norris-LaGuardia Act, 47 Stat. 70, § 2; Portal-to-Portal Act of 1947, 61 Stat. 84, § 1.

[18] The contention, however, found favor with the District Court: "Such catastrophic results are inevitable once we accept plaintiffs' underlying premise—that in determining the 'regular rate' intended by Congress, we must close our eyes to the contract in good faith negotiated between employer and employees and look only to the actual work pattern. Upon such a premise, genuine collective bargaining cannot live." 69 F. Supp. 956, 959.

ment should be effective in determining the regular rate of pay [19] but we think the words of and practices under the contract are the determinative factors in finding the regular rate for each individual.

As the regular rate of pay cannot be left to a declaration by the parties as to what is to be treated as the regular rate for an employee, it must be drawn from what happens under the employment contract. We think the most reasonable conclusion is that Congress intended the regular rate of pay to be found by dividing the weekly compensation by the hours worked unless the compensation paid to the employee contains some amount that represents an overtime premium. If such overtime premium is included in the weekly pay check that must be deducted before the division. This deduction of overtime premium from the pay for the workweek results from the language of the statute. When the statute says that the employee shall receive for his excess hours one and one-half times the regular rate at which he is employed, it is clear to us that Congress intended to exclude overtime premium payments from the computation of the regular rate of pay. To permit overtime premium to enter into the computation of the regular rate would be to allow overtime premium on overtime premium—a pyramiding that Congress could not have intended. In order to avoid a similar double payment, we think that any overtime premium paid, even if for work during the first forty hours of the workweek, may be credited against any obligation to pay

---

[19] "Collective bargaining, to be effective, must necessarily deal with large groups—with all the workers in the industry, or its subdivision, on whose behalf the bargaining is being conducted. And when, as in the I. L. A., such collective agreements are submitted to a vote of the membership affected, and that approval of the bargain thus arrived at is voted, it would make of collective bargaining a mockery if some of them could seek special terms, because, for a short period of time, their work experience has varied in some degree from that of their fellow workers."

statutory excess compensation.   These conclusions accord with those of the Administrator.[20]

The definition of overtime premium thus becomes crucial in determining the regular rate of pay.   We need not pause to differentiate the situations that have been described by the word "overtime." [21]   Sometimes it is used to denote work after regular hours, sometimes work after hours fixed by contract at less than the statutory maximum hours and sometimes hours outside of a specified clock pattern without regard to whether previous work has been done, e. g., work on Sundays or holidays. It is not a word of art.   See Premium Pay Provisions in Selected Union Agreements, Monthly Labor Review, U. S. Department of Labor, October 1947, Vol. 65, No. 4. Overtime premium has been used in this opinion as defined in note 3.   It is that extra pay for work because of previous work for a specified number of hours in the workweek or workday.   It is extra pay of that kind which we think that Congress intended should be excluded from computation of regular pay.   Otherwise the purpose of the statute to require payment to an employee for excess hours is expanded extravagantly by computing regular rate of pay upon a payment already made for the same purpose for which § 7(a) requires extra pay, to wit, extra pay because of excess working hours.   Accordingly, statutory excess compensation paid for work in excess of forty hours should not be used to figure the regular rate.   Neither should similar contract excess compensation for work

[20] See note 30 and *Walling* v. *Youngerman-Reynolds Hardwood Co., supra,* 424–25.

[21] Cf. Finding 28 (a): "Prior to the Fair Labor Standards Act, the word overtime had a generally accepted meaning in American industry, namely, excess time, to which a penalty rate of compensation was applied to discourage such work.   The idea of excessivity, however, was not an indispensable element of the concept of overtime as understood.   Overtime was also understood to cover hours outside of a specified clock pattern."

because of prior work be used in such a calculation. Extra pay by contract because of longer hours than the standard fixed by the contract for the day or week has the same purpose as statutory excess compensation and must likewise be excluded.[22] Under the definition, a mere higher rate paid as a job differential or as a shift differential, or for Sunday or holiday work, is not an overtime premium. It is immaterial in determining the character of the extra pay that an employee actually has worked at a lower rate earlier in the workweek prior to the receipt of the higher rate. The higher rate must be paid because of the hours previously worked for the extra pay to be an overtime premium.

---

[22] The holding in *Walling* v. *Helmerich & Payne, supra,* is not to the contrary of this position. The facts of that case indicated a palpable evasion of the statutory purposes. See 69 F. Supp. at p. 958, note 1.

Nor is the decision in *149 Madison Ave. Corp.* v. *Asselta, supra,* opposed to this position. In that case weekly wage contracts calling for a workweek of 46 and 54 hours provided the following formula for determining the regular hourly rate of pay: " 'The hourly rates for those regularly employed more than forty (40) hours per week shall be determined by dividing their weekly earnings by the number of hours employed plus one-half the number of hours actually employed in excess of forty (40) hours.' " 331 U. S. at 202. Under that method of computation an employee who worked 46 hours received a sum equal to what he would have received if he had been paid for 40 hours' work at the formula hourly rate and 6 hours of work at one and a half times the formula rate. As so construed, the extra pay for work in excess of 40 hours would be an overtime premium which could be excluded from the computation of the regular rate, and the regular rate would be the formula rate. The Court did not reach the question of the legality of that method of computation as it held that since the formula rate was not consistently employed in determining compensation, the formula rate could not be considered the regular rate for those who worked more than 40 hours. Accordingly the regular rate was held to be the average of all wages actually paid during the entire week. See *Asselta* v. *149 Madison Ave. Corp.,* 156 F. 2d 139, 141.

The trial court refused to accept the respondents' contention that the contract overtime rate was a shift differential, partly because it was felt that such a holding would have a disruptive effect on national economy. 69 F. Supp. 958–59. We use as examples three illustrations employed by the District Court to illustrate its understanding of the effect of respondents' contentions to employment situations. That court thought these illustrations indicated additional liability from the employer under § 7 (a).[23] We do not agree. Our conclusions as to the trial court's illustrations vary from those of the trial court because that court did not deduct overtime premiums, as we have defined them, actually paid from the weekly wage before dividing by the hours worked. See quotation from *Walling* v. *Youngerman-Reynolds Hardwood Co., supra,* at p. 461 of this opinion. (1) The employment contract calls for an overtime premium for work beyond thirty-six hours. Such extra pay should not be included as weekly wages in any computation of the regular rate at which a man works.[24]   (2) A contract

---

[23] The opinion stated:

"This controversy requires for its resolution a delicate adjustment to accommodate the harmonious application of three national policies. A heavy handed meshing of these three policies with the industrial machine which fails to minimize the friction at their points of contact can generate enough heat to impair one or more of the policies or severely injure the machine itself.

"In chronological order we have (1) the National Labor Relations Act, July 5, 1935, 49 Stat. 449, . . . to encourage the practice of collective bargaining; (2) the Fair Labor Standards Act, June 25, 1938, 52 Stat. 1060, . . . to correct and eliminate the labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency and general well being of workers; (3) the national need during the war for the maximum of production as illustrated by Executive Order 9301, February 9, 1943, 8 Fed. Reg. 1825, establishing the 48 hour week for the duration of the war." 69 F. Supp. 956, 958.

[24] 36 hours × $1 + 14 hours × $1.50 = total wages $57.   Regular rate = $57, less overtime premium of $7, ÷ 50 hours = $1 per hour.

provides for payment of time and a half for work in excess of eight hours in a single workday. An employee who works five ten-hour days would have no claim for statutory excess compensation if paid the amount due by the contract.[25] Or (3) a contract provides for a rate of $1 an hour for the first 40 hours and $1.50 for all excess hours; an employee works 48 hours and receives $52. To find his regular rate of pay, the overtime premium of $4 should be deducted and the resulting sum divided by 48 hours.[26] On the other hand, a man might be employed as a night watchman on an eight-hour shift at time and a half the wage rate of day watchmen. This would be extra pay for undesirable hours. It is a shift differential. It would not be overtime premium pay but would be included in the computation for determining overtime premium for any excess hours.[27]

Where an employee receives a higher wage or rate because of undesirable hours or disagreeable work, such

---

[25] 5 days×8 hours at $1 per hour+5 days×2 hours at $1.50 per hour=$55 total wage. Regular rate=$55—$5 ÷50=$1 per hour.

[26] Executive Order 9301, issued February 9, 1943, 8 Fed. Reg. 1825, provided that all government contractors should work their employees at least 48 hours per week. The Order provided that it should not be construed as superseding the provisions of any individual or collective bargaining agreement with respect to rates of pay for hours worked in excess of the agreed or customary workweek, nor as suspending or modifying any provision of the Fair Labor Standards Act or any other law relating to the payment of wages or overtime.

[27] For example, daytime watchman's pay, $.60 per hour. Nighttime watchman's pay $.90 per hour, eight-hour, seven-day shift. Sixteen hours would be compensated for at excess time rates. The watchman's pay would be 56×$.90=$50.40. His statutory excess pay 16×$.45=$7.20; total $57.60. His regular rate is ($57.60—$7.20)÷56 or $.90 per hour.

Compare Legal Field Letter 109, Office of the Solicitor, Department of Labor, July 31, 1946, 1947 Wage-Hour Man. 66, in which the Chief of the Wage-Hour Section characterizes a particular 50% differential as a shift differential.

wage represents a shift differential or higher wages because of the character of work done or the time at which he is required to labor rather than an overtime premium.[28] Such payments enter into the determination of the regular rate of pay. See *Cabunac* v. *National Terminals Corp.*, 139 F. 2d 853.

The trial court seemed to assume that if the contract overtime rate were a shift differential, the employee who worked on a higher paid shift would be entitled to have his higher shift rates enter into the computation of regular rate of pay. One of the reasons for not allowing the contract overtime rates in the computation of regular rate of pay was that it thought the great difference between the contract straight time and contract overtime rates showed that the premium paid by contract was not a shift differential but a true overtime premium. In this we think the trial court erred. The size of the shift differential cannot change the fact that large wages were paid for work in undesirable hours. It is like a differential for dangerous work. This contract called for $2.50 straight time hourly rate for handling explosives. The statutory excess compensation would, of course, be $3.75 per hour. If an employee receives from his employer a

---

[28] This is well brought out by a case similar in character to this litigation. *Ferrer* v. *Waterman S. S. Corp.*, 70 F. Supp. 1. There the wage schedule was as follows, p. 3:

GENERAL CARGO

| From | To | Work Days | Holidays |
|---|---|---|---|
| 7 A. M. | 12 M. D. | $0. 55 | $0. 77 |
| 12 M. D. | 1 P. M. | 0. 90 | 1..00 |
| 1 P. M. | 4 P. M. | 0. 55 | 0. 77 |
| 4 P. M. | 6 P. M. | 0. 77 | 0. 84 |
| 6 P. M. | 7 P. M. | 0. 90 | 1. 20 |
| 7 P. M. | 11 P. M. | 0. 77 | 0. 84 |
| 11 P. M. | 12 M. N. | 0. 90 | 1. 25 |
| 12 M. N. | 6 A. M. | 0. 84 | 1. 02 |
| 6 A. M. | 7 A. M. | 1. 30 | 1. 40 |

high hourly rate of pay for hard or disagreeable duty, he is entitled to the statutory excess compensation figured on his actual pay.

Nor do we find the District Court's reliance upon the fact that the overtime rates were employed in order to concentrate the work of the longshoremen in the straight time hours relevant to a determination of the respondents' rate of pay. The District Court thought the concentration was significant. It did not test whether the contract overtime rates contained overtime premium payments by considering whether the employee actually received extra compensation for excess hours. We accept the District Court's holding that this concentration was an intended effect of the overtime rates and that the higher rates did contribute to the concentration of the work in the straight time hours as set out in a preceding paragraph of this opinion. P. 456 *supra*. Such a concentration tends, in some respects, to the employment of more men, as there is pressure for more work to be done in the straight time hours. *Overnight Motor Co.* v. *Missel, supra,* 578. However, the pressure of the contract overtime wages is not solely toward a spread of employment. Since work is in fact done outside straight time hours, the employer can use men who have previously worked in straight time hours in contract overtime hours without additional cost.

But spread of employment is not the sole purpose of the forty-hour maximum provision of § 7 (a). Its purpose is also to compensate an employee in a specific manner for the strain of working longer than forty hours. *Overnight Motor Co.* v. *Missel, supra,* 578. The statute commands that an employee receive time and one-half his regular rate of pay for statutory excess compensation. The contract here in question fails to give that compensation to an employee who works all or part of his time in the less desirable contract overtime hours. Looked at

from the individual standpoint of respondents, the concentration of work does not have any effect upon their regular rate of pay. Because of this defect, the concentration of work brought about by the contract has no effect in the determination of the regular rate of pay. As we indicated at the beginning of this subdivision (1), a major purpose of the statute was to compensate an employee by extra pay for work done in excess of the statutory maximum hours. Thus the burdens of overly long hours are balanced by the pay of time and a half for the excess hours.

We therefore hold that overtime premium, deductible from extra pay to find the regular rate of pay, is any additional sum received by an employee for work because of previous work for a specified number of hours in the workweek or workday whether the hours are specified by contract or statute.[29]

(2) Since under Interpretative Bulletin No. 4, § 69, the Administrator refers to regular working hours as important in calculating the regular rate of pay under

---

[29] We avoid any extended discussion of respondents' suggestion that the proper way to determine the regular rate is to divide the wages received during the first forty hours of work in a week by 40. The quotient, it is suggested, would be the regular rate. One fault of that method, we think, is that such wages might contain overtime premium payments; for example, a contract which fixed a rate for 36 hours and a higher rate for subsequent hours. Another objection is that such a method of computation would give an improperly weighted average for the rate of pay for the entire week; an employee who performed more highly skilled or unpleasant work after 40 hours of work would not receive the proper amount of statutory excess compensation if the regular rate were computed only on the basis of the first 40 hours. The statement as to statutory excess hours in *Walling* v. *Youngerman-Reynolds Hardwood Co.*, 325 U. S. 419, 423, was made as to a situation where this Court concluded the dual pay plan of the case was "wholly unrealistic and artificial . . . so as to negate the statutory purposes." 323 U. S. 42. The problem we are here considering was not at issue.

§ 7 (a) of the Act, a word must be said as to regular working hours in this case.[30] "Regular working hours" apparently has not been defined by the Administrator. He could hardly have intended in § 69 to employ the statutory maximum hours as synonomous with regular working hours as there is no prohibition on regular working hours that are longer than the statutory maximum. His illustrations, numbers 2 and 3, show that overtime premiums may be earned within the first 40 hours of a workweek. The statutory maximum hours are significant only as requiring overtime premium pay. An employer may increase pay or decrease hours free as to those steps from statutory regulation. See article in Monthly Labor Review, *supra.* The trial court pointed out that "The identifying mark of the case at bar is the absence of any norm, any regularity. Both parties have emphasized the casual, irregular character of the employment." 69 F. Supp. 959-60. The trial court, as we have heretofore stated, pp. 456-457, also found that the "basic working day," defined by § 2 (a) of the agreement set forth in note 5, *supra,* was not the day normally, regularly or usually worked by respondents. Indeed the contract, § 1, required these round-the-clock irregular hours from some

[30] The question is sufficiently shown by this excerpt: "Extra compensation paid for overtime work, even if required to be paid by a union agreement or other agreement between the employer and his employees need not be included in determining the employee's regular hourly rate of pay (see par. 13 of this bulletin). Furthermore, in determining whether he has met the overtime requirements of section 7 the employer may properly consider as overtime compensation paid by him for the purpose of satisfying these requirements, only the extra amount of compensation—over and above straight time— paid by him as *compensation for overtime work—that is, for hours worked outside the normal or regular working hours*—regardless of whether he is required to pay such compensation by a union or other agreement." Interpretative Bulletin No. 4, United States Department of Labor, Wage and Hour Division, Office of the Administrator, revised November 1940.

individuals. We call attention to the problem only to lay it aside as inapplicable in this case.

However, the government contends in this case that regular working hours are important, that the contract fixed regular working hours as the straight time hours and that as an actual fact as shown by the statistics of concentration of work in straight time hours, p. 456, *supra,* the straight time hours were the regular working hours of all longshoremen. The government concludes from this that the contract straight time pay is the regular rate of pay and the contract overtime pay includes a true overtime premium. We may be mistaken in thus limiting the government's argument on this point. If the government means that any extra pay to an employee for work outside regular working hours of the group of employees is to be excluded from the computation of the regular rate, we do not think that contention sound. The defect in this argument, however the government's position is construed, is that it treats of the entire group of longshoremen instead of the individual workmen, respondents here. The straight time hours can be the regular working hours only to those who work in those hours. The work schedule of other individuals in the same general employment is of no importance in determining regular working hours of a single individual. As a matter of fact, regular working hours under a contract, even for an individual, has no significance in determining the rate of pay under the statute. It is not important whether pay is earned for work outside of regular working hours. The time when work is done does not control whether or not all or a part of the pay for that work is to be considered as a part of the regular pay.

We think, therefore, that this case presents no problems that involve determination of the regular hours of work. As an employment contract for irregular hours

the rule of dividing the weekly wage by the number of hours worked to find the regular rate of pay would apply. Cf. *Overnight Motor Co.* v. *Missel, supra,* at 580.

(3) The contract was interpreted by the Shipping Association and the Longshoremens Association as providing that the contract straight time was the regular rate. The parties to the contract indicated by their conduct that the contract overtime was the statutory excess compensation or an overtime premium.   Finding 43, 162 F. 2d at 672; see note 33, *infra*.[31]  Apparently no dispute or controversy arose over this interpretation although the contract, § 19, made provision for the resolution of such disagreements.   The trial court determined that the straight time hourly rate was the regular rate at which respondents were employed.[32]  This construction by the parties and the court's conclusion, supported by evidence, leads us to consider this agreement as though there was a paragraph which read to the effect that the straight time rate is the regular rate of pay.   We should also consider that the contract provided that the contract overtime rates were intended to provide any statutory excess compensation, when men worked more than forty hours except in those situations where the entire time, including the excess, was in the straight time hours.[33]   This of course

---

[31] As a matter of fact, in half of the cargo classifications the overtime rate was a few cents less per hour than time and a half the straight time rates.

[32] Conclusion of Law No. 3: "The 'straight time hourly rate' set forth in each subdivision of Paragraph 4 of the Collective Agreement, as stated in Finding of Fact No. 9, constituted the regular rate at which plaintiffs were employed when handling the stated kind of cargo."

[33] It is clear under the applicable section of the agreement, § 2 (a), note 5 above, that a man could work all his time wholly in contract overtime hours.  An employee received overtime premium for work done in what the trial court considered to be the basic workweek.  Finding 43 (a): "If, and only if, a longshoreman worked more than 40 hours between 8 a. m. and 12 noon, and 1 p. m. and

does not mean that respondents here were familiar with these purposes of the agreement. So far as the record shows, they worked for the pay promised under the words of the contract. It shows nothing more on this point.

Under the contract we are examining, the respondents' work in overtime hours was performed without any relation as to whether they had or had not worked before. Under our view of §.7 (a)'s requirements their high pay was not because they had previously worked but because of the disagreeable hours they were called to labor or because the contracting parties wished to compress the regular working days into the straight time hours as much as possible. As heretofore pointed out, we need not determine what were the regular working hours of these respondents. If it were important, the trial court determined that their regular working hours were not the straight time hours. They worked at irregular times. Finding 45, 162 F. 2d at 673. The record shows that all respondents worked 5,201 straight time hours and 20,771 overtime hours. Four of the twenty respondents worked no straight time hours. Five others worked less than 100 straight time hours. Three worked more straight time than overtime. The record does not show the hours these respondents worked for other employers. That fact is immaterial in this case as respondents seek recovery only from petitioner employers. These round-the-clock hours were in strict accordance with the contract which allowed the Longshoremens Association to furnish all men needed and called for the men to "work any night of the week, or on Sundays, Holidays, or Saturday afternoons, when required." §§ 1 and 2; see note 5. Men who worked contract overtime hours were entitled to contract overtime pay. They were given no overtime premium pay because

5 p. m. on Mondays to Fridays, inclusive, and between 8 a. m. and 12 noon on Saturday of that workweek, none of these days being a holiday, he was paid an additional sum for work on Saturday morning in excess of 40 hours—namely 62½ cents per hour, . . ."

of long hours.   It is immaterial that his regular rate may greatly exceed the statutory minimum rate.   This contract overtime rate, therefore, did not meet the excess pay requirements of § 7.

In finding the statutory excess compensation due respondents, the trial court must determine the method of computation.   Each respondent is entitled to receive compensation for his hours worked in excess of forty at one and a half times his regular rate, computed as the weighted average of the rates worked during the week.   In computing the amount to be paid, the petitioners may credit against the obligation to pay statutory excess compensation the amount already paid to each respondent which is allocable to work in those excess hours.   The precise method for computing this credit presents the difficulty.   According to the Administrator's interpretation, an employer may credit himself with an amount equal to the number of hours worked in excess of forty multiplied by the regular rate of pay for the entire week rather than an amount equal to the number of hours worked in excess of forty multiplied by the average rate of pay for those excess hours.[34]   Under that formula each respond-

---

[34] See  Interpretative  Bulletin  No. 4,  § 14.   The Administrator illustrates his position with the following example: an employee works 30 hours a week at an occupation paying 40 cents an hour and 20 hours in the same week at an occupation paying 50 cents an hour. The employee's regular rate of pay is 44 cents an hour (30 hours×40 cents+20 hours×50 cents÷50 hours), and he is entitled to receive $2.20 in addition to the $22 he has already received, equal to the number of overtime hours (10) multipled by one-half the regular rate of pay (22 cents).

If it were held that an employer, under the contract we are here considering, could credit himself only with the wages actually paid during the hours following the first 40, an employee who performed 40 hours of contract overtime work early in the week and 10 hours of straight time after the first 40 hours would receive a larger award than an employee who first worked 10 straight time hours and then worked 40 contract overtime hours.   Such a variation in the

ent is entitled, as statutory excess compensation, to an additional sum equal to the number of hours worked for one employer in a workweek in excess of forty, multiplied by one-half the regular rate of pay. On the record before us, that interpretation seems to be a reasonable one; we leave a final determination of the point to the District Court on further proceedings.

The Circuit Court ordered the case remanded to the District Court for determination of the amounts due respondents in accordance with its opinion. By a further order, it allowed the District Court to consider any matters presented to it by petitioners as a defense in whole or in part under the Portal-to-Portal Act. We modify these orders so as to permit the District Court to allow any amendments to the complaint or answer or any further evidence that the District Court may consider just.

As so modified the judgment of the Circuit Court of Appeals is affirmed.

MR. JUSTICE DOUGLAS took no part in the consideration or decision of this case.

MR. JUSTICE FRANKFURTER, with whom MR. JUSTICE JACKSON and MR. JUSTICE BURTON concur, dissenting.

No time is a good time needlessly to sap the principle of collective bargaining or to disturb harmonious and fruitful relations between employers and employees

---

amount of statutory excess compensation would not be in accord with the statutory purpose.

Compare, however, Releases 1913 and 1913 (a) issued by the Administrator on December 1, 1942 and January 5, 1943, which provide that an employer may if he so elects compute the regular rate on the basis of the number of hours worked in excess of 40. If that method of computation of the regular rate is followed, an employer could credit himself with the wages actually paid during the hours in excess of 40.

brought about by collective bargaining. The judgment of Congress upon another doctrinaire construction by this Court of the Fair Labor Standards Act ought to admonish against an application of that Act in disregard of industrial realities. Promptly after the Eightieth Congress convened, Congress proceeded to undo the disastrous decisions of this Court in the so-called portal-to-portal cases. Within less than a year of the decision in *Anderson* v. *Mt. Clemens Pottery Co.*, 328 U. S. 680, both Houses, by overwhelming votes that cut across party lines, passed, and the President signed, the Portal-to-Portal Act of 1947. What is most pertinent to the immediate problem before us is the fact that because the Fair Labor Standards Act had been "interpreted judicially in disregard of long-established customs, practices, and contracts between employers and employees," Congress had to undo such judicial misconstruction because it found that "voluntary collective bargaining would be interfered with and industrial disputes between employees and employers and between employees and employees would be created." [1] Because the present decision is heedless of a long-standing and socially desirable collective agreement and is calculated to foster disputes in an industry which has been happily at peace for more than thirty years, I deem it necessary to set forth the grounds of my dissent.

The Court's opinion is written quite in the abstract. It treats the words of the Fair Labor Standards Act as though they were parts of a cross-word puzzle. They are, of course, the means by which Congress sought to eliminate specific industrial abuses. The Court deals with these words of Congress as though they were unrelated to the facts of industrial life, particularly the facts pertaining to the longshoremen's industry in New York. The

---

[1] Section 1 (a), Portal-to-Portal Act of 1947, 61 Stat. 84, 29 U. S. C. § 251 (a).

Court's opinion could equally well have been written had the history of that industry up to 1916 not been an anarchic exploitation of the necessities of casual labor for want of a strong union to secure through equality of bargaining power fair terms of employment. See, *e. g.,* Barnes, The Longshoremen (1915), *passim.* Through such bargaining power the agreement was secured which the Court now upsets. Through this agreement, the rights and duties of the industry—the members of the union on the one hand and the employers on the other hand—were defined, and the interests of the men, the employers, and, not least, the community were to be adjusted in a rational and civilized way. On behalf of a few dissident members of the union, but against the protests of the union and of the employers and of the Government, the Court dislocates this arrangement and it does so by what it conceives to be the compulsions of § 7 (a) of the Fair Labor Standards Act.[2] This is to attribute destructive potency to two simple English words—"regular rate"—far beyond what they deserve.

Employment of longshoremen has traditionally been precarious because dependent on weather, trade conditions, and other unpredictables. Decasualization of their work has been their prime objective for at least sixty years. They have sought to achieve this result by inducing concentration of work during weekday daytime hours.

One of the strongest influences to this end is to make it economically desirable. And so the union has sought and achieved an addition to the basic—the regular—rate sufficiently high to deter employers from assigning work

---

[2] "No employer shall . . . employ any of his employees . . . for a workweek longer than forty hours . . . unless such employee receives compensation for his employment in excess of [forty hours] at a rate not less than one and one-half times the regular rate at which he is employed." 52 Stat. 1060, 1063, 29 U. S. C. § 207 (a).

outside of defined periods, except in emergencies. Since 1916, when the International Longshoremens Association made its first collective agreement with waterfront employers in New York, a 50% premium on night and weekend work has generally prevailed. In the industry, this has been colloquially called "overtime" pay.

Longshoremen do not usually work continuously for one employer, but shift from one to another, wherever employment can be found. The Fair Labor Standards Act does not entitle an employee who works a total of over forty hours per week for several employers, but not more than forty hours for any one of them, to any overtime pay. In view of the peculiarities of this industry, therefore, the only effective way of promoting the aim of the Fair Labor Standards Act, to deter a long workweek, is that devised by the collective agreement, namely, to limit to approximately the statutory maximum of hours the total length of the periods in the week for which additional pay amounting to overtime rates need not be paid, regardless of the employer for whom the work is done.

During the period (1943–45) in controversy, the wage rates were governed by the 1943 General Cargo Agreement between the International Longshoremens Association and the employers at the Port of New York. Under its terms, the "basic working week," for which "straight time" hourly rates were paid, included the hours of 8 a. m. to noon, and 1 p. m. to 5 p. m., Monday through Friday, and 8 a. m. to noon on Saturday.[3] "Overtime" rates, for

---

[3] "2 (a) The basic working day shall consist of 8 hours, and the basic working week shall consist of 44 hours. Men shall work any night of the week, or on Sundays, Holidays, or Saturday afternoons, when required. On Saturday night, work shall be performed only to finish a ship for sailing on Sunday, or to handle mail or baggage.

"(b) Meal hours shall be from 6 a. m. to 7 a. m., from 12 Noon to 1 p. m., from 6 p. m. to 7 p. m., and from 12 Midnight to 1 a. m.

.      .      .      .      .

"3 (a) Straight time rate shall be paid for any work performed

"all other time," were in almost all instances[4] 150% of the "straight time" rates. The 1943 Agreement embodied the practice of the industry since 1916, whereby approximately 150% of "straight time" rates was paid for night and weekend work. Through the years, with successive renewals of agreements between the International Longshoremens Association and the employers, the rates of pay have risen and the length of the "basic working week" has decreased. The respondents, members of the International Longshoremens Association, did a large part of their work for the petitioners outside of the enumerated "straight time" hours. In accordance with the collective agreement, they received, for whatever work they did during the "basic working week," "straight time" pay, and for work at all other times, "overtime" pay, drawing such "overtime" pay regardless of whether such work was or was not part of their first forty hours of work in the week.[5] They instituted this action, for double damages under § 16 (b) of the Fair Labor Standards Act, 52 Stat. 1060, 1069, 29 U. S. C. § 216 (b), assert-

---

from 8 a. m. to 12 Noon and from 1 p. m. to 5 p. m., Monday to Friday, inclusive, and from 8 a. m. to 12 Noon Saturday.

"(b) All other time, including meal hours and the Legal Holidays specified herein, shall be considered overtime and shall be paid for at the overtime rate.

"(c) The full meal hour rate shall be paid if any part of the meal hour is worked and shall continue to apply until the men are relieved. . . ."

[4] For purposes of this case, the "overtime" rate may be regarded as 150% of "straight time" in all instances, since the District Court allowed the respondents to recover for those few instances where the "overtime" was slightly less, and this portion of its judgment was not appealed.

[5] On the other hand, although the contract did not so specify, in the unusual situation of a longshoreman working over forty hours of "straight time" for one employer in one week, he was paid time and a half for the excess. Where this had not been done, the District Court allowed appropriate recovery, and this was not appealed.

ing that night and weekend work had been so frequent an incident of their employment that the contractual "straight time" pay could not be deemed their "regular rate" of pay, under § 7 (a), but that their "regular rate" was the average of what they received for all their work for any one employer, "straight time" and "overtime" together. On this theory, rejected by the union, the employers, and the Government, but now accepted by the Court, all work beyond forty hours per week for any one employer should have been paid for at one and one-half times this average.

The statutory phrase "regular rate" is not a technical term. Thirteen expressions used in the Fair Labor Standards Act were defined by Congress in § 3. "Regular rate" was left undefined. The legislative history of the phrase reveals only that it replaced "agreed wage" in an earlier draft, but there is no indication that this modification had significance. Nor is there any indication that in the field of labor relations, "regular rate" was a technical term meaning the arithmetic average of wages in any one week. If ordinary English words are not legislatively defined, they may rightly be used by the parties to whom they are addressed to mean what the parties through long usage have understood them to mean, when the words can bear such meaning without doing violence to English speech. The "regular rate" can therefore be established by the parties to a labor agreement, provided only that the rate so established truly reflects the nature of the agreement and is not a subterfuge to circumvent the policy of the statute. *Walling* v. *Youngerman-Reynolds Hardwood Co.*, 325 U. S. 419, 424. Thus the problem before us is whether the designation of "straight time rates" for the "basic working week" in the longshoremen's collective agreement was an honest reflection of the distinctive conditions of this industry.

We are not concerned with an abstract "regular rate" of pay, for industry is not. The "regular rate" in a given

industry must be interpreted in the light of the customs and practices of that industry. The distinctive conditions of the longshoremen's trade, where employees frequently work during one week for several different employers, are reflected in the provisions which the industry has made in determining rates of compensation. These provisions were designed to secure for longshoremen protection not only from harmful practices common to many industries and dealt with specifically by the statute, but also from those peculiar to the longshoremen's industry, requiring special treatment.

The respondents' wages, as part of a comprehensive arrangement for the betterment of the longshoremen's trade—also covering health and sanitary provisions, minimum number of men in a gang doing specified types of work, "shaping time," minimum hours of employment for those chosen at a "shape," arbitration, etc.—were determined by a collective agreement entered into between the union and the employers. The Fair Labor Standards Act was "intended to aid and not supplant the efforts of American workers to improve their own position by self-organization and collective bargaining." H. R. Rep. No. 1452, 75th Cong., 1st Sess., p. 9. "The right of individual or collective employees to bargain with their employers concerning wages and hours is recognized and encouraged by this bill. It is not intended that this law shall invade the right of employer and employee to fix their own contracts of employment, wherever there can be any real, genuine bargaining between them. It is only those low-wage and long-working-hour industrial workers, who are the helpless victims of their own bargaining weakness, that this bill seeks to assist to obtain a minimum wage." Sen. Rep. No. 884, 75th Cong., 1st Sess., pp. 3–4.[6] Such as-

---

[6] Similar intentions were expressed again and again in the Committee Hearings and on the floor of both Houses of Congress by the spokesmen of the Administration and Congressional Committee members. See the Joint Hearings before the Senate Committee on Labor

surances were necessary to allay the traditional hostility of organized labor to legislative wage-fixing. The Court now holds unlawful a collective agreement entered into by a strong union, governing the wide range of the longshoremen's employment relationships, and especially designed to restrict the hours of work and to require the same premium as that given by the statute for work done outside of normal hours but within the statutory limit. The Court substitutes an arrangement rejected both by the union and the employers as inimical to the needs of their industry and subversive of the process of collective bargaining under which the industry has been carried on. But, we are told, these untoward consequences are compelled by a mere reading of what Congress has written.

On the question you ask depends the answer you get. If the problem is conceived of merely as a matter of arithmetic you get an arithmetical answer. If the problem is put in the context of the industry to which it relates, and meaning is derived from an understanding of the problems of the industrial community of which this is just one aspect, a totally different set of considerations must be respected. The defendants derived their rights from the entire agreement and not from a part mutilated by isolation. If the parties had written out with unambiguous explicitness that the extra wage in the scheduled periods is to be deemed a deterrent against work during those periods and is not to be deemed a basis for calculating time and a half after the forty hours, I cannot believe that this Court would say that such an agreement,

---

and Education and the House Committee on Labor, 75th Cong., 1st Sess., pp. 46–47 (Asst. Atty. Gen. Jackson); *id.* pp. 181–83 (Secy. Perkins and Sen. Walsh); 81 Cong. Rec. 7650, 7651, 7808 (Sen. Black); 7652, 7799, 7800, 7885–86, 7937 (Sen. Walsh); 7813 (Sen. Pepper); 82 Cong. Rec. 1390 (Rep. Norton); 1395 (Rep. Randolph); 83 Cong. Rec. 7291 (Rep. Allen); 7310 (Rep. Fitzgerald); 9258 (Rep. Randolph).

made in palpable good faith, is outlawed by the Fair Labor Standards Act.

How is compensation for services above the limits set by the Act to be reckoned? The standard for compensation could be determined (1) by specific statutory terms; (2) by collective agreement; or (3) by judicial construction in default of either.

Congress could have laid down a hard and fast rule, could have expressed a purely arithmetic formula. It could have said that the rate on which time and a half is to be reckoned is to be found by dividing the total wage by the hours worked. It would not even have been necessary to spell all this out. Congress could have conveyed its thought by using the phrase "average" instead of "regular." And where we have nothing else to go on, except the total wage and the hours, it is reasonable enough thus to ascertain the regular rate. But when parties to a complicated industrial agreement, with full understanding of details not peculiarly within the competence of judges, indicate what the regular rate is for purposes of contingencies and adjustments satisfied otherwise than by a purely arithmetic determination of the rate of wages, nothing in the history of the law or its language precludes such desirable consensual arrangements, provided, of course, that the parties deal at arm's length, and that the defined "regular" rate is not an artifice for circumventing the plain commands of the law. Such an artifice would obviously not be used in a contract made by workers in their own interests represented by a union strong enough to pursue those interests. Regularity in this context implies of course a controlling norm for determining wages which, though agreed upon between the parties, is consistent with, and not hostile to, the underlying aims of the overtime provision of the Fair Labor Standards Act. Discouragement of overwork and of under-

employment are the aims. The longshoremen's collective agreement serves the same purpose as does the statute.

The Fair Labor Standards Act is not a legislative code for the government of industry. It sets a few minimum standards, leaving the main features in the employment relation for voluntary arrangement between the parties. Where strong unions exist, relatively little of the employment relation was to be enforced by law. Most of it was left to be regulated by free choice and usage as expressed and understood by the unions and employers. Congress did not provide for increase in basic rates except to the limited extent of establishing minimum wages. The inclusion of such minimum wages is in itself a recognition by Congress of the distinction between what it sought to change and what it sought to use only as the basis for the computation of an overtime percentage.

The claim of the few members in opposition to the union is predicated upon an amount superadded for reasons peculiar to the stevedoring industry to the wage which the parties to the agreement in perfect good faith established as the regular rate. The union members secured this extra wage as part of the entire scheme of the collective agreement.[7] This premium is not to be detached from the scheme as though it were a rate fixed by law as a basis for calculating the statute's narrowly limited overtime provision. So long as its minimum wage provisions were complied with, the statute did not seek to change the true basic or "regular" rate of pay in any industry, from which rate all statutory overtime is to be computed. There is no justification for interpreting the statutory term as including elements clearly understood

---

[7] Cf. Lord Stowell, in *The Neptune,* 1 Hagg. Adm. *227, *232: ". . . the natural and legal parents of wages are the mariner's contract, and the performance of the service covenanted therein; they in fact generate the title to wages."

in the industry to be as foreign to the "regular rate" as any strictly overtime rates. Here the extra wage is the industry's overtime rate for work which might not be within the overtime period of the Fair Labor Standards Act, but was within the schedule of the collective agreement for extra wages, not because the work was overtime in the ordinary industrial sense but because it was at periods during which all work was sought to be discouraged by making it costly. Because the union secured for its men an extra wage even for not more than forty working hours, the scope of the Fair Labor Standards Act as to overtime is not enlarged. Only for a work-week longer than forty hours is an employee to be paid one and a half times "the regular rate," and nothing in the Act precludes agreement between the parties as to what the regular rate should be, provided such agreement is reached in good faith and as a fair bargain. The presupposition of the Act was that voluntary arrangements through collective bargaining should cover an area much wider, and economically more advantageous, than the minimum standards fixed by the Act. The traditional process of collective bargaining was not to be disturbed where it existed. It was to be extended by advancing the economic position of workers in non-unionized industries and in industries where unions were weak, by furthering equality in bargaining power. It certainly was not the purpose of the Act to permit the weakening of a strong union by eviscerating judicial construction of the terms of a collective agreement contrary to the meaning under which the industry had long been operating and for which the union is earnestly contending.

There can be no quarrel with the generality that merely because the conditions of employment are arrived at through collective bargaining an arrangement which violates the statute need not be upheld. But this does not

mean that in determining whether the contractual desig-
nation of certain hours as "basic" is honest and fair,
we cannot consider the fact that the contract was one
entered into by a powerful union, familiar with the needs
of its members and the peculiar conditions of the industry,
and fully equipped to safeguard its membership. To
view such a contract with a hostile eye is scarcely to
carry out the purpose of Congress in enacting the Fair
Labor Standards Act.

This Court has sustained the power of "employer and
employee . . . to establish [the] regular rate at any
point and in any manner they see fit," *Walling* v. *Young-
erman-Reynolds Hardwood Co.,* 325 U. S. 419, 424, pro-
vided that the regular rate is not computed "in a wholly
unrealistic and artificial manner so as to negate the statu-
tory purposes." *Walling* v. *Helmerich & Payne,* 323 U. S.
37, 42. If we were confronted with an agreement which
did not reflect the true practice in the industry, if despite
the designation of certain hours as "basic" and others
as "overtime," the distinction was not actually observed,
but work was done at all times indiscriminately, so that
what the contract designated as "overtime" pay was in
reality a "shift differential," designed to induce employees
to work at less pleasant hours, rather than to deter
employers from carrying on at such hours, the labels
attached by the parties to the various periods of work
would not be allowed to conceal the true facts. We have
again and again pierced through such deceptive forms.
See, *e. g., Walling* v. *Helmerich & Payne,* 323 U. S. 37;
*Walling* v. *Youngerman-Reynolds Hardwood Co.,* 325
U. S. 419; *Walling* v. *Harnischfeger Corp.,* 325 U. S. 427;
*149 Madison Ave. Corp.* v. *Asselta,* 331 U. S. 199. But
here there is no suggestion that the agreement mislabeled
the true circumstances of the employment relationship.
And it is significant that in no case in which we found

that the terms used had distorted the true facts did a union which had made the contract appear to defend it.

The fact that some work was done at odd hours does not misrepresent the regular situation, provided that such work was exceptional and was restricted in frequency by the overtime provisions of the agreement, so that what the agreement treated as regular and what as exceptional were truly just that. We turn then to the actual experience, in representative periods, of the Port of New York longshoremen. The stipulations, exhibits, and findings of the District Court, all demonstrate the exceptional nature of "overtime" work.[8] It is also apparent that such night work as was done was usually done in addition to, rather than instead of, daytime work. The increased compensation for such work therefore served principally to achieve the same result as did the statute—namely, to afford a higher rate of compensation for long hours. In peacetime, night work was extremely rare for anyone as a recurring experience, and even during the exigencies of war only a small minority was principally so occupied.

The accuracy of the designation of one period or

---

[8] The following figures were either stipulated by the parties, found as facts by the District Court and concurred in by the Circuit Court of Appeals and this Court, or computed from such statistics:

| | 1932–37 average | Oct. 24, 1938 (effective date of FLSA) to Aug. 31, 1939 (eve of war) | Apr. 1, 1944– Mar. 31, 1945 (height of wartime activity) |
|---|---|---|---|
| Work performed during straight time hours | 79.93% | 75.03% | 54.5% |
| Night work | 15.13% | 17.89% | 20.5% |
| Weekend work | 4.94% | 7.08% | 25.0% |
| Total night work by men who had worked during same day | 13.2% | 23.29% | 44.5% |
| Ditto by those who had not | 86.8% | 76.71% | 55.5% |
| Total man-hours, consisting of night work by those who had not worked during same day | 2.57% | 4.17% | 11.1% |
| Concentration of man-hours, straight time over overtime | 11.22 | 8.47 | 3.38 |

amount of work as "basic" is not contradicted by the fact that some work may have been done at other times as well. The very reference in any collective agreement to overtime pay for unusual hours implies that some such work is anticipated. A protective tariff need not be so high as to exclude every last item. The statistics in the margin amply justify the trial judge's conclusion that the designations in the collective agreement were not unreal or artificial when the agreement was entered into, and did not become so even at the height of the abnormal wartime effort.

Of course, even if most of the work of longshoremen was performed during "straight time" hours, if the 50% increment for work at other times was not a true overtime payment, but a shift differential, this higher rate of pay would have to be taken into account in establishing the "regular rate" of the respondents. But the District Court found that this premium constituted true overtime. As that court stated (Finding 28), a shift differential

> "is an amount added to the normal rate of compensation, which is large enough to attract workers to work during what are regarded as less desirable hours of the day, and yet not so large as to inhibit an employer from the use of multiple shifts,"

while a true overtime premium

> "is an addition to the normal rate of compensation, designed to inhibit or discourage an employer from using his employees beyond a specified number of hours during the week or during certain specified hours of the day. A safe guide for distinguishing between the shift differential and the overtime premium is by the degree of spread between the normal rate and the penalty rate. Whereas a shift differential is usually 5 or 10 cents per hour, the overtime premium is generally 50 per cent of the normal rate."

These findings of the District Court are amply supported by the testimony and by industrial statistics. See 65 Monthly Labor Review 183–85; Wage Structure: Machinery (Bureau of Labor Statistics 1945) p. 21; *id.* (1946) p. 38; Wage Structure: Foundries (Bureau of Labor Statistics 1945) Tables 32, 33; *id.* (1946) pp. 44–45. And compare the Directives of the Economic Stabilization Director dated March 8, 1945, and April 24, 1945, limiting the shift differentials which the National War Labor Board could approve to four cents per hour for the second shift and six or eight cents per hour for the third. CCH Labor Law Service, vol. 1A, ¶¶ 10,034.11, 10,462. Applying the test based on Finding 28, and finding also that the differential had in fact served to deter night and week-end work, the District Court held that the fifty per cent increment was true overtime and not a shift differential.

The Court purports to accept the findings of the District Court, and yet it concludes that the District Court erred in finding that the fifty per cent was by way of overtime and not a shift differential. The District Court, to be sure, did not explicitly state that the premium was not a shift differential in one of its formal Findings of Fact. It did so state, however, in its opinion and this conclusion depended on the statements quoted above from Finding 28 as to the characteristics indicative of true overtime and shift differentials. I fail to see how this Court can accept Finding 28 and reject the conclusion that the contractual "overtime" was not a shift differential.

Findings of lower courts are to be disregarded only if not substantiated by the evidence. Here, the evidence supporting the finding was impressive, and yet the Court strains to overturn it to reach a result not urged as socially desirable but only as demanded by legal dialectic.[9]

---

[9] That the hours designated by the agreement as "overtime" were regarded by the union as *excessive* hours, rather than merely as

The Court holds that even if the collective agreement accurately designated the regular and overtime work of the generality of longshoremen, it cannot apply to the respondents, because of their particular working hours for a stretch of the wartime period here in controversy. This contention expresses an attitude toward the process of collective bargaining which, if accepted, would undermine its efficacy. It subjects the collective agreement to the hazards of self-serving individualism, which must inevitably weaken the force of such agreements for improving the conditions of labor and forwarding industrial peace. Here, the very increased rates of pay which the respondents received for exceptional night and weekend work was the result of the contract which they now seek to disavow.

Collective bargaining between powerful combinations of employers and employees in an entire industry, each group conscious of what it seeks and having not merely responsibility for its membership but resourceful experience in discharging it, is a form of industrial government whereby self-imposed law supplants force. Cf. Feis, The Settlement of Wage Disputes (1921) c. II. This is an accurate description of the process by which the stevedoring industry has served the greatest port in the United States. Yet the Court rejects the meaning which the parties to the agreement have given it and says it means what the parties reject. Often, too often, industrial strife is engendered by conflicting views between employers and employees as to the meaning of a collective agree-

---

*unpleasant* hours, may also be deduced from the fact that they included much weekday time in which there was ample daylight during a large part of the year, and were not confined to nights and weekends. Another indication of the same thing is the fact that the history of the union agreements for New York longshoremen reveals a succession of reductions of the total number of "straight time" hours parallel to the reduction of the usual weekly working hours during the same period throughout American industry.

ment.   Here the industry as an entirety—the union and the employers' association—is in complete accord on the meaning of the terms under which the industry has lived for thirty years and under which alone, the parties to the agreement insist, they can continue to live peacefully.   But a few members of the union assert an interest different from that of their fellows—some thirty thousand—and urge their private meaning even though this carries potential dislocation to the very agreement to which they appeal for their rights.   Unless it be judicially established that union officers do not know their responsibility or have betrayed it, so that what appears to be a contract on behalf of their men is mere pretense in that it does not express the true interests of the union as an entirety, this Court had better let the union speak for its members and represent their welfare, instead of reconstructing, and thereby jeopardizing, arrangements under which the union has lived and thrived and by which it wishes to abide.[10]

Collective agreements play too valuable a part in the government of industrial relationships to be cast aside at the whim of a few union members who seek to retain their benefits but wish to disavow what they regard as their burdens.   Unless the collective agreement is held to determine the incidents of the employment of the entirety for whom it was secured, it ceases to play its great role as

---

[10] Of course, if it can be shown that particular employees—for reasons of color, lack of seniority, or anything else—were not fairly or properly represented in the collective bargaining agreement, and were discriminated against and forced into a less desirable class of work, not because of accident or their own desire but because of the deliberate policy of the employers, the union, or both, we cannot treat the agreement made for the generality of longshoremen as binding upon them as well.  See *Steele* v. *Louisville & N. R. Co.*, 323 U. S. 192; *Tunstall* v. *Brotherhood of Locomotive Firemen and Enginemen*, 323 U. S. 210.  The respondents' claim was not based upon any such allegation.

an instrument of industrial democracy. Cf. Rice, *Collective Labor Agreements in American Law*, 44 Harv. L. Rev. 572; Wolf, *The Enforcement of Collective Labor Agreements: A Proposal*, 5 Law & Contemp. Prob. 273; Hamilton, *Collective Bargaining*, 3 Encyc. Soc. Sci. 628, 630.

But furthermore, as I read the Court's opinion, it is not limited in application to those employees most or all of whose work was done at night, but extends equally to those who worked chiefly during the "basic working week," but also did a few hours of work at other times. Even where a longshoreman worked precisely forty hours of "straight time," followed by a few hours of "overtime" in the same week, payment of the appropriate wages as determined by the collective agreement would not satisfy the Court's test that only such extra pay as is given "for work because of previous work for a *specified* number of hours in the workweek or workday" [11] can be regarded as true overtime pay. To require specification in an industry where the only thing certain is uncertainty is to command the impossible. There is no justification for such a test in the statute, its history, industrial practice, judicial decision, or administrative interpretations.[12]

In short, this is not a decision that where the predominant work of an employee is paid for at "overtime" rates, such rates enter into computation of the "regular rate," but rather that where the conditions in an industry are such that the number of "straight time" hours cannot be precisely predicted in advance, an arrangement for time and a half for all other hours cannot be legal, regardless of how unusual work outside of the "straight time" hours may be.

---

[11] Italics supplied.

[12] The Interpretations of the Wage-Hour Administrator pertinent to this case are conflicting and inconclusive. Citation of the most relevant should suffice. Cf. §§ 69, 70, Interpretative Bulletin No. 4, Wage and Hour Division, Department of Labor.

But whether or not the Court means to go as far as it seems to go, and even if its holding is later limited to the narrow situation now before us, I cannot agree with its conclusion. It seems to me that the "regular rate" of pay for Port of New York longshoremen was the "straight time" scale provided for by the union contract, and that this was true for the whole union, including the individual respondents. Far from receiving less overtime than the statute required, the respondents were, through the agreement, the recipients of much more. To call their demand one for "overtime pyramided on overtime" is not to use a clever catchphrase, but to describe fairly the true nature of their claim.

I would reinstate the judgments of the District Court.