Elizabeth HUTKA, Appellant/Cross–
Appellee,

v.

SISTERS OF PROVIDENCE IN
WASHINGTON, Appellee/Cross–
Appellant.

Nos. S–10706, S–10735.

Supreme Court of Alaska.

Dec. 10, 2004.

Kenneth W. Legacki, Anchorage, for Appellant and Cross–Appellee.

John A. Treptow and Jahna M. Lindemuth, Dorsey & Whitney LLP, Anchorage, for Appellee and Cross–Appellant.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

FABE, Justice.

## I. INTRODUCTION

In this appeal, we address questions arising from the state and federal law overtime claims of a home health care supervisor. Appellant Elizabeth Hutka is a nurse who worked as a supervisor for Providence Hospital and was classified by Providence as exempt from receiving overtime payments after she received a promotion. Hutka's em-

ployment responsibilities included supervising nurses who provided personal care to patients in their homes, reviewing time sheets and task sheets, reviewing payroll records, and visiting patients at home to manage their care. The superior court granted summary judgment to Providence on Hutka's Alaska Wage and Hour Act (AWHA) claim on the ground that Hutka was exempt under AS 23.10.060(d)(12) because her position included the provision of medical services. The superior court found that Hutka could, however, recover overtime compensation under the Fair Labor Standards Act (FLSA). After a bench trial, the superior court found that Hutka had worked an average of 2.71 overtime hours per week from July 1992 to May 1995.

We affirm in part and reverse in part the trial court's decision.

## II. FACTS AND PROCEEDINGS

In October 1990 Providence Hospital hired Elizabeth Hutka as a staff registered nurse. From November 1991 to August 1995, Hutka worked as a supervisor for the Home Health Care unit, headquartered on hospital grounds in Providence's former convent. In July 1992 Providence promoted Hutka from a team leader assistant paid on an hourly basis to a home health aide supervisor paid by salary. After giving her this promotion, Providence classified Hutka's new position as exempt from earning overtime wages and stopped compensating her for time worked in excess of forty hours a week.

In March 1994 Hutka filed a complaint with the Alaska Department of Labor to ask for an official determination as to whether Providence could classify her as exempt from receiving overtime. Providence initially responded to the Department of Labor that, as a supervisor, Hutka was exempt from the Alaska Wage and Hour Act (AWHA); it later also contested the Alaska regulation defining nurses as nonexempt under the AWHA.

Hutka filed a complaint in superior court on July 26, 1995 to recover overtime compensation under the AWHA. The trial court denied both Providence's summary judgment

motion that alleged Hutka was exempt as a supervisor and Providence's request for a ruling that nurses should not be entitled to bring overtime claims under the AWHA.

The trial court did, however, grant Providence partial summary judgment on January 13, 2000, holding that Hutka could not bring an AWHA claim because AS 23.10.060(d)(12) exempts employees "whose employment includes the provision of medical services." [1] Providence had already acknowledged that Hutka did not provide medical care as her primary responsibility. In an affidavit submitted on behalf of Providence by Kathy Lum, a co-director of Home Health Care, Lum testified that

> the primary function of the home health aides that Ms. Hutka supervised was to provide personal care, time sheet and task sheet review and verification, as opposed to medical care, for patients in their homes.... The important thing to note is that Ms. Hutka, and the other supervisor of home health aides, Joan Hamilton, both were responsible for reviewing time sheets, task sheets, and giving their approval for payroll purposes.

The superior court found, however, that "there is no maximum or minimum quantification in the statute. Therefore, based on Ms. Hutka's statements [that she provided patient care], she is exempt."

Hutka then moved on February 7, 2000 to amend her complaint to add a Fair Labor Standards Act (FLSA) claim for overtime compensation. Providence filed a motion to dismiss the FLSA claim, arguing that it did not relate back to the original complaint and that it unfairly prejudiced Providence. The superior court denied the motion to dismiss but allowed Providence to bring a motion to sanction Hutka for her failure to timely allege the federal law claim. The court ultimately assessed attorney's fees in the amount of $7,134.50 against Hutka as a sanction for the untimely amendment.

A nonjury trial commenced on June 5, 2000 to determine the number of overtime hours worked by Hutka, and her entitlement to overtime compensation under the FLSA.

---

1. AS 23.10.060(d)(12).

Providence had required Hutka and other exempt staff to fill out time cards but several witnesses testified that Providence directed that the actual hours worked by exempt employees should not be recorded. Michelle Lorenzen Iverslie, who hired Hutka in July 1992 and supervised her until August 1994, testified that "there were times when [Hutka] put down more than 80 [hours] and I would scratch it out and write exempt employee and write 80." Iverslie also stated that "there were times that [Hutka] wrote down actual hours but ultimately ... it had to be 80 hours every two weeks ... that was the bottom line." Iverslie further testified that while she may not have crossed out the daily number of hours when Hutka put more than eight, she would tell Hutka "don't do this again, you're an exempt employee."

Joan Hamilton, who held the same position as Hutka and shared responsibilities with her from January 1993 to August 1994, testified that the time cards that were submitted to Providence did not reflect the number of hours she and Hutka worked. Hamilton also testified regarding the number of hours worked by Hutka. "[Hutka and I] worked ... pretty consistently 10 hours a day but more heavily on the payroll weeks." According to Hamilton, payroll was done every two weeks, and she and Hutka

> were responsible for collecting ... forms on Fridays before payroll and also going ... to Providence on the weekends to collect [forms] ... then [they] would come home ... [each] with a stack of forms that [they] had to go through minutely detailed exercises tallying up ... many ... hours were spent ... to get those papers submitted to payroll by their deadline Monday morning ... life on payroll weekends was pretty much work.

Hutka herself testified with regard to the time cards that she had made an effort to keep track of extra hours worked but "was reprimanded by [her] supervisors that [she] was messing up the whole payroll system by doing that." Hutka also testified that "[the time card] had to say eight on Monday through Friday whether [she] came to work or not or whether [she] was there 10 hours." Hutka alleged that she worked an average of

11.16 hours of overtime a week for the period from July 1992 to May 1995.

The superior court found that there were inconsistencies and contradictions in the evidence presented: "Ms. Hutka told the Department of Labor that time cards were accurately kept, at least after a certain point and then testified differently at trial. Ms. Hutka put time on the time cards when she was taking annual leave and also when she was on sick leave." After considering this conflicting evidence, the court found that it was more likely than not that Hutka worked an average of 2.71 hours of overtime per week, the estimate given by Providence. The court granted a directed verdict to Providence as to Hutka's claims that shift differential and on-call pay rates should be included in the computation of overtime rates, finding that

> the shift differential part of the salary ... is a contract provision and it's not a contract to which Ms. Hutka was a party.... Her contract with Providence was as a supervisory employee that didn't include that and what she has available to her are the FLSA remedies. She has no contract remedies in that sense so shift differential is not applicable....
>
> As to the on-call pay, the standard there is the extent to which it burdens her life and the testimony from Ms. Hutka as well as ... Ms. Hamilton, was that it seemed to be an insignificant burden on her life....

The superior court ultimately awarded Hutka $14,574.18 in unpaid wages, $10,584.96 in prejudgment interest (10.5% per annum), $14,574.18 in liquidated damages, and $5,678.63 in attorney's fees. On the issue of liquidated damages, the court found that "[a]lthough this is a close question, it does appear more likely than not that the employer was testing the line and had reason to believe that there was no exemption applicable to Ms. Hutka.... Certainly there was not clear and convincing evidence of good faith."

Hutka appeals the following trial court decisions: (1) the determination that she is exempt under AWHA as a provider of medical services; (2) the finding in favor of Providence's estimate that Hutka worked an aver-

age of 2.71 hours of overtime a week; (3) the decision not to include shift differential and on-call rates in the computation of overtime; and (4) the assessment of attorney's fees against her for the untimely amendment of her complaint. Providence cross-appeals on two points, arguing that the superior court erred in its decision to award both prejudgment interest and liquidated damages under an FLSA claim for overtime and that the court erred in allowing Hutka to claim and receive damages for three years of overtime under the two-year statute of limitations.

## III. DISCUSSION

### A. Standard of Review

■ We review grants of summary judgment de novo.[2] We "must determine whether any genuine issue of material fact exists and whether the moving party is entitled to judgment on the law applicable to the established facts."[3] We view "the facts presented in the light most favorable to the nonmoving party" when reviewing a grant of summary judgment.[4] A finding of fact, however, "shall not be set aside unless clearly erroneous."[5] A clearly erroneous finding of fact "is one that leaves this court with a definite and firm conviction that a mistake has been made."[6] On questions of law, we will adopt the rule of law that is most persuasive in light of precedent, reason, and policy.[7] A trial court's decisions on admissibility of evidence will not be set aside unless there is an abuse of discretion.[8] The award of attorney's fees is also "committed to the discretion of the trial court."[9] We will "interfere with the exercise of that discretion only where it has been abused."[10] "An abuse of discretion is established where it appears that the trial court's determination as to attorney's fees was manifestly unreasonable."[11]

### B. Exemption for Providers of Medical Services Under AS 23.10.060(d)(12)

■ We first consider whether Hutka was exempt under AS 23.10.060(d)(12) and therefore ineligible to bring an Alaska Wage and Hour Act claim. Hutka argues that the legislative history establishes that only a person who is directly providing medical services is exempt. The Alaska Legislature originally enacted an exemption under AS 23.10.060 in 1962 for hospital employees.[12] From 1962 until 1983, the exemption applied to "any employee of a nonprofit hospital."[13] In 1983 the legislature amended the provision to include the current wording of the exemption which states that the overtime section does not apply to "an employee of a hospital whose employment includes the provision of medical services."[14] The amendment was made at the request of Humana Hospital's executive director, Ronald Pavellas, Dennis Dewitt of the Alaska State Hospital Association, and other Humana administrators and employees.[15] A letter signed by Humana

2. *Bennett v. Weimar*, 975 P.2d 691, 694 (Alaska 1999).

3. *Martinez v. Ha*, 12 P.3d 1159, 1161 (Alaska 2000) (internal quotation marks and citations omitted).

4. *Id.* at 1162 (internal quotation marks and citations omitted).

5. *Barios v. Brooks Range Supply, Inc.*, 26 P.3d 1082, 1085 (Alaska 2001).

6. *Id.*

7. *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

8. *Harris v. Keys*, 948 P.2d 460, 466 (Alaska 1997).

9. *Palfy v. Rice*, 473 P.2d 606, 613 (Alaska 1970).

10. *Id.*

11. *Id.*

12. Ch. 3, § 1, SLA 1962.

13. During this time, the statute stated "the provisions of this section shall not apply with respect to . . . (16) any employee of a nonprofit hospital." Ch. 3, § 1, SLA 1962.

14. AS 23.10.060(d)(12).

15. The committee discussion suggests that Humana Hospital, a for-profit hospital, had purchased Alaska Hospital, a nonprofit hospital, and that consequently there was a change in the scheduling structure that upset some Humana administrators and nurses. *See* Minutes of House Labor and Commerce Committee, April 22, 1983, testimony of Dennis Dewitt (Tape 83–

employees, which was reviewed by the House Labor and Commerce Committee, stated that "[i]n order to meet the needs of our community, we naturally must be available 7 days a week, 24 hours a day, making a 40 hour workweek difficult to schedule." [16] Humana administrators and employees also stated that changes in the statute were necessary to allow more flexibility in scheduling. Upon hearing the testimony, Representative Cowdery "moved and asked unanimous consent to adopt the [amendment] to the [bill]. There was no objection and it was so ordered." [17]

Humana Hospital's testimony suggests that one factor that influenced the legislature's decision to extend the amendment was the interest in keeping medical facilities open and providing more flexible schedules for employees whose extended hours of labor were needed to maintain the hospital in operation at all times. This interpretation of the legislative intent may call into question whether the medical provider exemption should apply to an employee like Hutka who spent many of her overtime hours at home reviewing payroll records. An alternative, broader interpretation of the statutory intent is that it was designed not for the limited purpose of providing flexibility to medical staff but rather with the objective of enhancing access to health care generally. And the home health care that Hutka supervised is included within this objective.

Providence correctly argues that the plain language of the statute favors the latter interpretation. "The plain language of the statute simply states that it applies to any hospital worker whose job 'includes the provision of medical services.' Nothing in the statute or legislative history suggests that the Legislature somehow intended to state

'primarily consists of,' but mistakenly ended up with 'includes.' " There are no words in the plain language that imply any restrictions on the extent of the "medical services [provided]." [18]

But Hutka points to an opinion letter from the Department of Labor, submitted by Providence in support of its motion for summary judgment. The Department of Labor opinion letter stated that the exemption should be limited to those who "directly provide medical services":

> [I]t was the department's position that the qualification which limits the exemption to employees whose employment included the provision of medical services should be added for the specific purpose of restricting the exemption to doctors, nurses, technicians, treating specialists and like employees. Employees such as maintenance, office clerical, janitorial, culinary, and others who do not directly provide medical services would remain eligible for overtime.

The original wording of the provision when it was enacted in 1962 provided that "any employee of a nonprofit hospital" was exempt. The opinion letter suggests that the amended phrasing in 1983 to "an employee of a hospital whose employment includes the provision of medical services," was intended to qualify and limit the exemption.

The legislative intent, as shown through the 1983 amendment and the opinion letter from the Department of Labor, suggests that the exemption would not apply to a clerical worker whose job is exclusively administrative. And if the provision of medical care is not part of a worker's regular duties and is performed only on rare occasions, there re-

---

58, Side B, No. 153). Five registered nurses also testified in favor of the 8/80 hour workweek applied to hospitals. *See* Minutes of House Labor and Commerce Committee, April 26, 1983, testimony of Lucy Matchett, Alice Schmitt, Debbie Fleming, Judy Williams, and Carolyn Spehas (Tape 83–60, Side A, Nos. 230–321). Interestingly, one of them supported the change but "asked that the legislation include provisions to protect employees from being exploited by it." *See* Minutes of House Labor and Commerce Committee, April 26, 1983, testimony of Alice Schmitt (Tape 83–60, Side A, No. 255).

**16.** *See* 1983 House Labor and Commerce Committee files, Microfiche No. 2570; Minutes of the House Labor and Commerce Committee, April 22, 1983, testimony of Ron Pavellas (Tape 83–58, Side B, No. 186).

**17.** Minutes of House and Labor Commerce Committee, April 26, 1983 (Tape 83–60, Side A, No. 368).

**18.** AS 23.10.060(d)(12).

mains a question whether such an employee would be exempt. But if an employee's duties include the provision of direct medical services, then the exemption does apply. Thus, the remaining inquiry is whether there exists a material question of fact regarding whether Hutka's position as a supervisor of home health care requires her to provide medical services sufficient to qualify her as a direct provider of medical care.

Providence points out that Hutka testified that she provided direct medical care to patients. In an affidavit in support of her opposition to Providence's motion for summary judgment on the supervisory employee exception, Hutka testified that "at least three times a week, for at least ... four hours a day, for a total of ... 12 hours, I would visit patients to review their care plans, institute care plans on their behalf ... [and carry out] the doctors' orders that they prescribed for a patient.... During the week, I would also have to call doctors to get orders or double check or review their orders to make sure they were accurate." Hutka concedes in her testimony that she visited patients and managed their care plans. From this evidence, we can conclude that Hutka provided direct medical care and that this provision of care was not an isolated occurrence but part of her regular duties. Because she directly provided medical services, Hutka is exempt as a provider of medical services under AS 23.10.060(d)(12).

## C. Burden–Shifting Analysis To Determine the Number of Overtime Hours for Which Hutka Should Receive Compensation

We next turn to Hutka's contention that the superior court erred in its computation of Hutka's overtime compensation because it did not follow a burden-shifting framework. Under the FLSA, an employee ordinarily "has the burden of proving that he performed work for which he was not properly compensated."[19] In *Anderson v. Mt. Cle-*

*mens Pottery Co.,* however, the Supreme Court instructed that when an employer fails to maintain adequate records concerning the employee's hours, as required by the FLSA, the employee may meet this burden by producing "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference."[20] If the employee meets this minimum threshold, the burden shifts to the employer to "come forward with evidence of the precise amount of work performed or with evidence to [negate] the reasonableness of the inference to be drawn from the employee's evidence."[21] We adopted the *Mt. Clemens* burden-shifting framework in *Barios v. Brooks Range Supply, Inc.*[22] We recognized that the law requires an employer to keep records of all hours worked by an employee entitled to overtime, and we held that when the employer fails to keep adequate records, the *Mt. Clemens* standard applies.[23]

In the present case, the superior court did not expressly apply the *Barios* and *Mt. Clemens* burden-shifting analysis. Rather, it discussed the conflicting evidence presented by Providence and Hutka without reference to the evidentiary burdens that apply when an employer fails to keep records. The trial court found:

> The record is divergent in many ways concerning the hours worked. Time cards were kept but several witnesses said that the employer directed they not be kept accurately. The employer needed accurate breakdown of the time worked to properly allocate time to different funding programs. Ms. Hutka told the Department of Labor her time cards were accurate, at least after a certain point and then testified differently at trial. Ms. Hutka put time on the time cards when she was out on sick leave—medical leave. There were other inconsistencies and contradictions in the evidence presented. Considering all of the conflicting evidence, it is found by the court that it is more likely than not that

19. *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946).

20. *Id.*

21. *Id.* at 687–88, 66 S.Ct. 1187.

22. 26 P.3d 1082 (Alaska 2001).

23. *Id.* at 1086.

Ms. Hutka worked an average of 2.71 hours per week of overtime.

Providence argues that the trial court was not required to apply the burden-shifting analysis because Providence did not fail to keep records. But as the trial court pointed out, "time cards were kept but several witnesses said that the employer directed they not be kept accurately." By ordering employees to refrain from accurately recording their time worked, Providence failed to keep adequate records in accordance with the FLSA. Thus, the trial court was required to apply the burden-shifting framework. But while the trial court did not refer to or discuss *Barios* in its decision, its reasoning paralleled the *Barios* burden-shifting approach.

Under the proper approach, the first question is whether Hutka presented sufficient evidence from which the court could draw a "just and reasonable inference" of the amount and extent of her overtime work. Hutka testified that she worked an average of 11.16 overtime hours per week. She claimed that she computed this average based on accurate time records that she had tracked in her personal diary in 1993. Hutka presented testimony from two witnesses, her former supervisor and a co-worker, who corroborated this estimate. Joan Hamilton, who held the same position as Hutka and shared responsibilities with her from January 1993 to August 1994, testified that she and Hutka consistently worked ten hours a day "but more heavily on payroll weeks," which were every other weekend. Hutka's former supervisor, Michelle Lorenzen Iverslie, testified that she personally worked ninety hours a week for a period of eleven weeks in 1992 and that Hutka's workload must also have increased with the advent of a new contract that year. In light of the testimony provided by Hamilton and Iverslie, we determine that Hutka did provide sufficient evidence for the court to draw a "just and reasonable inference" that she worked overtime and was not correctly compensated.

Because Hutka met this threshold requirement, the burden shifted to Providence to provide evidence of the precise amount of work performed or to negate the reasonableness of the inference drawn from Hutka's evidence. In addressing the question whether Providence carried out this burden, it is helpful to examine separately the two periods for which Hutka claims overtime. We first consider the evidence presented by Providence pertaining to Hutka's work from January 1994 to May 1995, and second the evidence presented by Providence regarding the period from July 1992 to December 1993.

### 1. The period from January 1994 to May 1995

Providence presented evidence that Hutka worked an average of 2.71 hours of overtime per week during the period from January 1994 to May 1995. Providence obtained this measurement by extrapolating from a statement Hutka made in her written complaint to the Department of Labor. On March 29, 1994, Hutka reported the following information to the Department of Labor:[24]

> I had some overtime from 7/11/92 until 12/26/92 but no work records were kept. I began keeping track of how much time I actually worked in pay period 1 of 1993 (12/27/92 began p.p.) through the end of 12/93. I was told I could balance out the extra hours in a week by leaving early on days since the start of 1994. I do not need to collect any wages from 1/94 to the present, I have tried to work only 40 hours each week, and just record any overtime.

Providence directed the trial court's attention to Hutka's statements that she did "not need to collect any wages from 1/94 to the present" (March 29, 1994) because she tried to work only forty hours and "just record any overtime." Based upon Hutka's indication that she accurately recorded her overtime in 1994, Providence's program director, Kathy Lum, added the total number of recorded overtime hours on Hutka's time cards from 12/26/93 to 5/20/95, divided by the number of work weeks, and used this derived figure of

---

24. It appears that when Hutka refers to accurate tracking in 1993 she is not referring to the accuracy of her timecards, but is instead describing a personal calendar or diary in which she tracked her actual hours for 1993.

2.71 hours as the average estimate of Hutka's weekly overtime.[25] Because Hutka's testimony that she "tried to work only 40 hours each week and just record any overtime" could be viewed as a concession of the accuracy of her time records kept after January 1994, it is arguable that the evidence of recorded overtime presented by Providence provided a precise calculation of Hutka's overtime during this period. And even if these calculations are not precise, the trial court's implicit finding that Providence negated the reasonableness of Hutka's inference of 11.16 hours is supported by the record. As the superior court concluded, "Ms. Hutka told the Department of Labor her time cards were accurate, at least after a certain point and then testified differently at trial." We therefore determine that Providence satisfied its burden as to the period from January 1994 to May 1995 by presenting evidence that Hutka's time records were accurate, and we cannot conclude that the superior court's finding of a weekly average of 2.71 hours of overtime was erroneous when applied to this period.

### 2. The period from July 1992 to December 1993

The remaining question, therefore, is whether Providence met its burden as to the period between July 1992 and December 1993. Although the superior court also applied Providence's average of 2.71 overtime hours a week to Hutka's work during this period, that average was computed based on Hutka's time records for 1994 and 1995 and thus is not a precise calculation for Hutka's work during 1992 and 1993.

■ But Providence argues that it negated the reasonableness of Hutka's estimate of hours worked during this period. The superior court found that there were "inconsistencies and contradictions in the evidence presented by Hutka at trial." As Providence points out, Hutka conceded at trial that she failed to recalculate her overtime when she converted her claim from an AWHA to an FLSA claim.[26] The superior court also found that Hutka included annual leave and sick leave in her estimates of average hours worked.[27] Hutka claimed that she had computed her average of 11.16 overtime hours by calculating the average overtime worked each week during 1993 when she kept a personal calendar or diary in which she tracked her actual hours for that year. But during cross-examination, Providence compared the diary with Hutka's reports of overtime to the Department of Labor and pointed out at least six specific vacation and sick days that Hutka had included in her computation of overtime hours during 1993.[28] Providence also demonstrated discrepancies between Hutka's diary and the reported calculations, particularly during six weeks in 1993 in which Hutka claimed up to nine hours per week more in overtime than she had recorded in her diary.[29]

In *Barios*, we determined that "the fact that the employer did not keep records means only that the burden-shifting standard of *Mt. Clemens* applies. But the employer may still meet its burden of proof through

25. In its appellate brief, Providence inaccurately cites the transcript to support an assertion that by averaging the number of overtime hours on Hutka's 1993 time cards it arrived at the estimate of 2.71 hours of overtime per week during 1993. In fact the transcript indicates that Providence averaged the number of hours from 12/26/93 to 5/20/95 to reach the estimated figure of 2.71 hours.

26. Although the AWHA compensates overtime for work exceeding eight hours a day, the FLSA claim only allows recovery for time worked in excess of forty hours a week. *Webster v. Bechtel*, 621 P.2d 890, 895 (Alaska 1980).

27. The inclusion of these days off in Hutka's calculations may also have been a consequence of her calculation of overtime hours exceeding

eight hours in a day rather than forty hours a week because some of the days off occurred during the middle of a work week.

28. Providence pointed out that the following sick days and vacation days were included in Hutka's computation of overtime: 7/5/93, 8/23/93, 9/29/93, 9/30/93, 2/19/93, 3/12/93.

29. Providence claimed that there were six to nine hours of discrepancies between Hutka's diary and her reported overtime hours during the following six weeks: 3/29/93–4/3/93 (8.5 hours); 4/4/93–4/10/93 (7.75 hours); 4/11/93–4/17/93 (7.5 hours); 7/4/93–7/10/93 (6 hours); 8/22/93–8/28/93 (8 hours); 11/21/93–11/27/93 (7 hours).

other forms of evidence." [30] Witness credibility determinations are left to the trial court and "there is no reason the judge cannot find the testimony of other witnesses to be more credible in the absence of employer records." [31] Given the contradictions in Hutka's testimony and evidence, the trial court could find that the defense witness, Kathy Lum, was a more credible witness than Hutka. And the court had discretion to find that the defense effectively refuted Hutka's account of the nature and extent of her employment. Thus, the trial court could reasonably conclude that Providence negated the reasonableness of Hutka's assertion that she worked 11.16 hours of overtime a week during this period. Once Providence met its burden, the trial court did not err in favoring Providence's estimate of 2.71 hours per week. We conclude that the trial court's analysis of the evidence was consistent with that required by *Barios* and therefore affirm the trial court's computation of overtime.

### D. Shift Differential Rates in the Computation of Hutka's Overtime Rate of Pay

■■■ Hutka's next argument regarding the calculation of her hours concerns the amount of her "rate" of overtime pay. Hutka asserts that premium rates for shift differentials should be included in her overtime rate. We begin our analysis by considering Providence's policies regarding shift differential pay. Providence's hospital policies provide premium pay rates for "nonexempt" employees who work evening, night, or weekend shifts. Providence refers to evening and night rates as "shift differentials" and calls weekend rates "weekend differentials." [32]

Providence's overtime policy includes shift differential rates of pay in the calculation of the regular rate of pay for computing overtime "if applicable." This adjusted regular rate is then multiplied by 1.5 to compute the amount of overtime compensation earned. The Providence policy on weekend differentials, however, does not allow weekend differential rates to be "added to the employee's base rate of pay." [33]

The superior court found that

> the shift differential part of the salary ... is a contract provision and it's not a contract to which Ms. Hutka was a party.... Her contract with Providence was as a supervisory employee that didn't include that and what she has available to her are the FLSA remedies. She has no contract remedies in that sense so shift differential is not applicable.

The trial court decided that although Hutka is not exempt from receiving overtime under the FLSA, other contract terms that Providence provides to employees classified as "nonexempt" should not apply to Hutka unless these terms are also mandated by the FLSA. Under the FLSA, a "regular rate" is defined as all remuneration for employment paid to, or on behalf of, the employee. [34] This definition suggests that Hutka's "regular rate" should include the pay rate of all compensation Providence paid to her for her employment. If Providence had paid her a premium for the hours she worked during differential shifts, then the FLSA would require that such premiums be included in the regular rate. Since Providence did not pay Hutka such a premium from July 1992 to

30. *Barios,* 26 P.3d at 1087.

31. *Id.*

32. Hutka claims that the court's decision to grant Providence's motion for directed verdict on shift-differential and on-call pay contradicted the court's pretrial decision to take judicial notice of base pay, including differential and on-call pay. We conclude that Hutka's argument fails because courts may only take judicial notice of adjudicative facts that are "not subject to reasonable dispute." *United States v. Ritchie,* 342 F.3d 903, 908 (9th Cir.2003) (citation omitted). There were no undisputed facts concerning these rates

because Hutka did not receive either differential or on-call pay from July 1992 to May 1995, and her contract with Providence classified her as exempt from receiving differential or on-call pay, and we agree with Providence that the trial court's judicial notice of Ms. Hutka's claimed on-call and shift-differential rates of pay "was legally irrelevant to the calculation of her overtime rate under the FLSA."

33. It appears that this "base rate" refers to the "regular rate" for computation of overtime, but the policy does not clearly state this.

34. 29 U.S.C. § 207(e).

May 1995, the FLSA would not require a premium adjustment to the regular rate.

The only other provision of Section 207 of the FLSA that concerns shift differentials places a restriction on when such premiums can be added to the regular rate. Under Section 207(e)(7), a "regular rate" shall not include a premium for additional hours if the premium is more than 1.5 times the regular pay.[35] The negative phrasing of the provision again indicates that the inclusion of the premium is not mandatory unless it is part of a contract.

Hutka's reasoning relies heavily on *Thomas v. Howard University Hospital*,[36] a case that involved an employer that had already paid its employees a shift differential premium as a part of their employment compensation but had failed to include the premium in their "regular rate." In that case, there was no question as to whether the employees were entitled to premium rates; such premium rates were clearly granted to the employees under their collective bargaining contract and on that ground, *Thomas* is distinguishable from this case.

A second case cited by Hutka, *Local 246 Utility Workers Union of America v. Southern California Edison*,[37] is also distinguishable on the basis that it involved an employee who was clearly entitled to supplementary pay. The central question in that case was whether such supplementary pay, disability pay, can be considered compensation and included in the regular rate for overtime compensation.

The dicta in *Local 246* appears to reinforce the superior court's decision rather than strengthen Hutka's argument. The Ninth Circuit relied on *Bay Ridge Operating Co. v. Aaron*[38] for the proposition that "[t]he regular rate of pay cannot be left to a declaration by the parties as to what is to be treated as the regular rate for an employee; it must be drawn from what happens under the employment contract." [39] The *Local 246* court further reasoned that "[t]he regular rate ... must reflect all payments which the parties have agreed shall be received regularly during the workweek.... It is not an arbitrary label chosen by the parties; it is an actual fact." [40] The established fact in this case is that Hutka's contract with Providence did not provide premium rates for her work during evenings and nights, and did not pay her such premiums for these hours.

Providence convincingly argues that the FLSA does not mandate the addition of any premium rate to Hutka's "regular rate" of pay for purposes of computing overtime. The superior court's judgment that Hutka should not include shift differential rates of pay in her computation of overtime hours was not in error.

### E. On–Call Rates in the Computation of Hutka's Overtime Rate of Pay

A question similar to the issue of shift differential is whether Hutka is entitled to add an on-call premium to her "regular rate" for purposes of computing overtime.[41] The trial court found that the standard for determining whether Hutka is entitled to include on-call rates "is the extent to which it burdens her life and ... it seemed to be an insignificant burden to her life."

■■ Providence points to three cases with holdings similar to that of the superior court.[42] One of these, *Owens v. Local 169,*

35. 29 U.S.C. § 207(e)(7).

36. 39 F.3d 370 (D.C.Cir.1996).

37. 83 F.3d 292 (9th Cir.1996).

38. 334 U.S. 446, 464, 68 S.Ct. 1186, 92 L.Ed. 1502 (1948).

39. *Local 246*, 83 F.3d at 296 (internal citations omitted).

40. *Id.* at 297 (internal citations omitted).

41. Hutka claims that the court misinterpreted her argument because she is entitled to on-call pay as a matter of contract. Providence correctly argues that Hutka's contract did not include on-call pay. Providence's on-call policy clearly states that "[s]upervisory/management employees will not be compensated for administrative call." Hutka acknowledges that she was a supervisor and that the only on-call hours she worked were for administrative call. Therefore, under Providence's policies Hutka was not eligible for on-call pay.

42. *Armour & Co. v. Wantock*, 323 U.S. 126, 132, 65 S.Ct. 165, 89 L.Ed. 118 (1944); *Reimer v. Champion Healthcare Corp.*, 258 F.3d 720, 725 (8th Cir.2001); *Owens v. Local 169, Association*

sets forth the two predominant factors to be used in determining whether an employee's on-call time is compensable as overtime: (1) the employee's freedom to engage in personal activities, and (2) the agreements between the parties.[43] Hutka's own trial testimony suggested that her administrative on-call hours did not restrict her freedom. And Providence correctly points out that Hutka's contract did not require that she receive on-call pay rates for administrative call. We conclude that the superior court's application of the legal standard of the extent to which on-call hours burden an employee's life was not in error. We affirm the superior court's factual finding that the burden of on-call time on Hutka appeared insignificant. We also affirm the superior court's conclusion that the contract did not include on-call pay.

### F. The Award of Attorney's Fees to Providence

■ We now turn to Hutka's last challenge in her appeal, her contention that the trial court's award of attorney's fees to Providence constituted improper fee shifting. The trial court granted fees to Providence as a sanction against Hutka for her untimely amendment of her complaint in 2000 to include an FLSA claim, five years after she filed her original complaint in 1995.

Providence does not allege that it incurred any additional expenses relating to the late filing of Hutka's FLSA complaint. Providence instead argues that it moved for the reimbursement of partial attorney's fees that it had "unnecessarily expended defending the now-defunct AWHA claims as a sanction for the late amendment." Providence apparently believes that the fees expended on the AWHA claim were "unnecessary" because Hutka's AWHA claim was unsuccessful. But to the extent that Providence seeks fees spent on defending an unsuccessful AWHA claim, this reimbursement amounts to fee shifting, which is impermissible under the AWHA. We have previously held in *Grimes v. Kinney Shoe Corp.* that a prevailing defen-

dant in an AWHA action to recover wages is not entitled to an award of attorney's fees and costs.[44] Even if Hutka had timely filed to amend her complaint to include the FLSA claim, the two claims were not mutually exclusive and Providence did not demonstrate to the superior court a nexus between the late filing of the FLSA claim and additional expenses it must incur because the AWHA and FLSA claims were not brought together.

Of course attorney's fees for dilatory amendments may be appropriate if the late filing of a complaint prejudices an opposing party and the fees provide a remedy for curing the prejudice. Such prejudice may result when the opposing party did not have the opportunity to question a witness regarding the new claim during a previous deposition and must re-depose a witness to ask additional questions relating to issues that arise in the amended complaint. But there must be a showing of a specific nexus between the late filing and additional expenses; otherwise, the fees would not necessarily be associated with the delay or issues of lack of notice. The mere amendment of the complaint to include the FLSA claim was not objectionable.

Because the award of attorney's fees for expenditures Providence incurred defending Hutka's "now-defunct AWHA claims" constituted impermissible fee shifting under the AWHA, the trial court erred in awarding $7,134.50 in attorney's fees to Providence. We reverse and vacate the trial court's judgment on this issue.

### G. Liquidated Damages and Prejudgment Interest Under the FLSA

■ We next consider Providence's arguments on cross-appeal. Providence first contends that the trial court erred when it awarded Hutka both liquidated damages and prejudgment interest. In support of this contention, Providence cites the United States Supreme Court's decision in *Brooklyn Savings Bank v. O'Neil,*[45] as well as a long

---

*of Western Pulp and Paper Workers,* 971 F.2d 347 (9th Cir.1992).

**43.** 971 F.2d at 350.

**44.** 938 P.2d 997, 1001 (Alaska 1997).

**45.** 324 U.S. 697, 715, 65 S.Ct. 895, 89 L.Ed. 1296 (1945) (holding that the liquidated damages provision in the FLSA is not penal in its nature

line of FLSA cases that have held that a plaintiff cannot recover both liquidated damages and prejudgment interest under the FLSA because "[s]uch awards compensate an employee twice for delay in receiving back wages."[46]

■ Hutka argues that Providence waived its right to contest the damages award on appeal.[47] Providence only briefly raised the point within a footnote in an unrelated pre-trial opposition to Hutka's motion to supplement the record with her partially admitted exhibit called "Elizabeth Hutka—Wage Claim Calculations."[48] But Providence failed to seek a ruling on this issue or include this point in its objection to the proposed judgment. Arguments not raised in the trial court are waived and will not be considered on appeal, except to the extent that plain error has been committed.[49] We determine that Providence's footnote in a response to an unrelated motion did not constitute a properly raised objection. Therefore, Providence waived its right to contest the damages award on appeal.

Providence argues that even if it did not raise this issue below, the dual award would constitute plain error, subject to review at any stage of the proceedings. Plain error exists where an "obvious mistake" has been made.[50] The FLSA cases decided since *Brooklyn Savings Bank v. O'Neil* uniformly hold that a dual recovery is not allowed[51] and that an award of prejudgment interest cannot be made in addition to an award of liquidated damages. The resolution of this issue under the FLSA differs from our approach under the AWHA,[52] and Hutka has cited no authority to refute Providence's argument that the FLSA prohibits double recovery. The award of both liquidated damages and prejudgment interest constitutes plain error. We therefore determine that under the FLSA, Hutka's additional prejudgment interest award amounts to double recovery of $10,584.86, and should be vacated.

## H. The Statute of Limitations Under the FLSA

■ The last issue we consider is Providence's argument that the superior court erred when it allowed Hutka to receive three

---

but constitutes compensation for delay in payment of sums due under the Act; therefore, if liquidated damages are awarded under the FLSA, then prejudgment interest must be offset from the liquidated damages to avoid double compensation for damages arising from delay).

**46.** *See id.* at 715, 65 S.Ct. 895; *Braswell v. City of El Dorado,* 187 F.3d 954, 957 (8th Cir.1999); *Gibson v. Mohawk Rubber Co.,* 695 F.2d 1093, 1102 (8th Cir.1982); *Mathis v. Housing Auth. of Umatilla County,* 242 F.Supp.2d 777, 788–90 (D.Or.2002); *NOAA v. IBEW,* 57 F.L.R.A. 430, 2001 WL 888295 (2001); *see also EEOC v. First Citizens Bank of Billings,* 758 F.2d 397, 403 (9th Cir.1985) (holding that liquidated damages under FLSA are "compensatory, not punitive in nature").

**47.** Hutka also attempts to analogize FLSA remedies to tort remedies. "The court venue … dictates the remedies on damages for tort … the same rationale … should apply to this statutory claim for unpaid wages." Hutka provides no authority to support this argument.

**48.** This is the same exhibit Hutka alleges that the trial court judicially noticed.

**49.** *Wettanen v. Cowper,* 749 P.2d 362, 364 (Alaska 1988) (citing *Miller v. Sears,* 636 P.2d 1183 (Alaska 1981)).

**50.** *Id.*

**51.** *See Braswell v. City of El Dorado,* 187 F.3d 954, 957 (8th Cir.1999); *Gibson v. Mohawk Rubber Co.,* 695 F.2d 1093, 1101 (8th Cir.1982); *Mathis v. Housing Auth. of Umatilla County,* 242 F.Supp.2d 777, 788–90 (D.Or.2002); John A. Glenn, Annotation, *Recovery of Interest in Fair Labor Standards Act Suits,* 17 A.L.R. Fed. 343 (1973); *see also EEOC v. First Citizens Bank of Billings,* 758 F.2d 397, 403 (9th Cir.1985) (holding that liquidated damages under FLSA are "compensatory, not punitive in nature").

**52.** We have decided in favor of a different approach under the AWHA, under which we allow the award of both liquidated damages and prejudgment interest. *See Bobich v. Stewart,* 843 P.2d 1232, 1236–37 (Alaska 1992). "Bobich urges this court to adopt the logic of *Brooklyn Savings Bank v. O'Neil,* in which the U.S. Supreme Court, interpreting the FLSA, held that Congress had in fact intended liquidated damages to substitute for prejudgment interest. Therefore, where the trial court awarded both prejudgment interest and liquidated damages, the Supreme Court overturned the interest part of the award as a double recovery. We have not chosen to read the AWHA in the same way as the U.S. Supreme Court has read the federal act." *Id.* at 1237 n. 7 (citations omitted).

years of overtime damages under the two-year statute of limitations. The statute of limitations under the FLSA is two years but a court may apply a three-year statute of limitations if a particular employer's conduct embodies a "willful violation." [53] Providence argues that Hutka should not have received three years of overtime damages. Hutka again asserts that Providence waived its right to appeal this issue because it did not raise it below. We conclude that the issue was not waived because Providence had previously sought partial summary judgment and dismissal based on the two-year statute of limitations. Providence preserved the issue by asserting, among other arguments, that the FLSA provides a two-year statute of limitations for unpaid overtime unless the violation is willful. We therefore conclude that the trial court should not have applied a three-year statute of limitations unless Providence "willfully" violated the statute.

■ To prove a particular FLSA violation "willful," the Supreme Court has generally required evidence that an employer either knew or "showed reckless disregard for whether its conduct was prohibited by the statute." [54] In addressing liquidated damages the superior court expressly found that "it does appear more likely than not that the employer was testing the line and had reason to believe that there was no exemption applicable to Ms. Hutka...." This is tantamount to a finding that Providence recklessly disregarded the applicable law, and thus committed a willful violation as that term has been defined in relation to the three-year statute of limitations. There was ample evidence to support the superior court's finding in this regard. For example, the superior court noted that although timecards were kept, the

employer directed that they not be kept accurately.[55] And when Hutka attempted to record her hours accurately, her supervisor admittedly would "scratch it out and write exempt employee," telling Hutka "don't do this again, you're an exempt employee." Based on the superior court's finding and its support in the record, we affirm its application of the three-year statute of limitations.

## IV. CONCLUSION

We AFFIRM the trial court's finding that Hutka is exempt under the Alaska Wage and Hour Act because she conceded that she provided direct care to patients approximately twelve hours a week. We also AFFIRM the superior court's determination that Hutka worked an average of 2.71 hours of overtime per week. We AFFIRM the superior court's decisions not to include shift differential or on-call rates because the court's rulings on these issues were not in error. We REVERSE and VACATE the award of attorney's fees against Hutka because it constituted improper fee shifting. We REVERSE the award of prejudgment interest because under the FLSA a plaintiff may not recover prejudgment interest in addition to an award of liquidated damages. We AFFIRM the court's decision to allow a three-year, rather than a two-year, statute of limitations on the FLSA claim in light of the superior court's finding that Providence was "testing the line" and had reason to believe that no exemption applied to Hutka.

**53.** 29 U.S.C. § 255; *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 135, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988).

**54.** 29 U.S.C. § 255; *McLaughlin*, 486 U.S. at 135, 108 S.Ct. 1677.

**55.** *See, e.g., Brennan v. General Motors Acceptance Corp.*, 482 F.2d 825, 828 (5th Cir.1973), in which the Fifth Circuit determined that an employer's violation must be termed willful when immediate supervisors instructed employees to limit the hours recorded for payroll purposes despite the fact that upper levels of management

regularly encouraged the full reporting of overtime and sought to learn of all overtime worked. ("Because the immediate supervisors were primarily responsible for the employees' failing to report all overtime, we believe they may have had actual knowledge of the unreported overtime. At the very least they had constructive knowledge, for they had the opportunity to get truthful overtime reports but opted to encourage artificially low reporting instead. The company cannot disclaim knowledge when certain segments of its management squelched truthful responses.").